**Francesco FOTI, a/k/a Frank Foti, Petitioner,**

v.

**IMMIGRATION AND NATURALIZATION SERVICE, Respondent.**

No. 295, Docket 27345.

United States Court of Appeals Second Circuit.

Argued April 3, 1962.

Decided Sept. 21, 1962.

Clark, Waterman, Moore, and Smith, Circuit Judges, dissented.

James J. Cally, of Cally & Cally, New York City, for petitioner.

Roy Babitt, Sp. Asst. U. S. Atty., S. D.N.Y., New York City (Robert M. Morgenthau, U. S. Atty., New York City, on the brief), for respondent.

Before LUMBARD, Chief Judge, and CLARK, WATERMAN, MOORE,

FRIENDLY, SMITH, KAUFMAN, HAYS and MARSHALL, Circuit Judges.

FRIENDLY, Circuit Judge.

Foti is a resident alien who entered this country on a seaman's visa and stayed illegally for ten years, leaving his wife and three children in Italy. When deportation proceedings were instituted, he conceded his deportability, but applied to the Attorney General for relief under § 244(a) (5) of the Immigration and Nationality Act, 8 U.S.C.A. § 1254(a) (5), which provides that "the Attorney General may, in his discretion, suspend deportation and adjust the status to that of an alien lawfully admitted for permanent residence, in the case of an alien who * * * is a person whose deportation would, in the opinion of the Attorney General, result in exceptional and extremely unusual hardship to the alien * * *." The Attorney General, through his Special Inquiry Officer, ruled that Foti did not qualify as a case of "exceptional and extremely unusual hardship," and therefore that no ground to exercise the granted discretion arose, but permitted voluntary departure. The decision was upheld by the Board of Immigration Appeals, and Foti now seeks to have us review it under § 106 of the Act, 8 U.S.C.A. § 1105a, enacted Sept. 26, 1961, 75 Stat. 651, providing for review of final orders of deportation by courts of appeals by petition for review brought within six months.

Although the Immigration and Naturalization Service joins the petitioner in urging us to assume jurisdiction, in contrast to the position it has taken elsewhere, the matter is one that we must determine on our own account. The panel which heard the case upheld jurisdiction by a 2–1 vote, Judges Clark and Hincks forming the majority and the writer dissenting. Because of the important consequences of a decision that the recent Congressional grant to the courts of appeals of exclusive jurisdiction to review "final orders of deportation" was not in fact limited to such orders, as the language of the statute would indicate, but extended also to the variety of discretionary orders withholding or suspending deportation which the Attorney General is authorized to make, this case and the companion case of Ng Yen, 308 F.2d 796, were deemed appropriate for *in banc* consideration. This has resulted in a determination, four judges dissenting, that we have no jurisdiction, the majority believing that although decision either way has its difficulties, there is no sufficient reason for expanding the words used by Congress beyond their well-understood meaning.

The text we must construe is § 106, added to the Immigration and Nationality Act of 1952 in 1961, 75 Stat. 651, 8 U.S.C.A. § 1105a. This directs, § 106 (a), that "The procedure prescribed by, and all the provisions of the Act of December 29, 1950, as amended (64 Stat. 1129; 68 Stat. 961; 5 U.S.C. 1031 et seq.)," providing for review in the courts of appeals of certain orders of the Federal Communications Commission, the Secretary of Agriculture, the Federal Maritime Board (and its predecessors), and the Atomic Energy Commission, "shall apply to, and shall be the sole and exclusive procedure for, the judicial review of all final orders of deportation heretofore or hereafter made against aliens within the United States pursuant to administrative proceedings under section 242(b) of this Act or comparable provisions of any prior Act * * *"

Section 242 of the Immigration and Nationality Act of 1952, 8 U.S.C.A. § 1252, sets up a comprehensive procedure to determine the deportability of an alien. Section 242(b), into which the new statute is expressly keyed, directs that "A special inquiry officer shall conduct proceedings under this section to determine the deportability of any alien," states in great detail how this shall be done, and lays down that "The procedure so prescribed shall be the sole and exclusive procedure for determining the deportability of an alien under this section." This specification of procedural safeguards is immediately followed by § 242(c), providing that "When a final or-

der of deportation under administrative processes is made against any alien, the Attorney General shall have a period of six months from the date of such order, or, if judicial review is had, then from the date of the final order of the court, within which to effect the alien's departure from the United States * * * "; during that period the alien may be detained. Section 242(d) adds that "Any alien, against whom a final order of deportation as defined in subsection (c) of this section, heretofore or hereafter issued has been outstanding for more than six months, shall, pending eventual deportation, be subject to supervision under regulations prescribed by the Attorney General", and § 242(e) imposes a criminal penalty upon "Any alien against whom a final order of deportation is outstanding by reason of being a member of any of the classes" described in certain paragraphs of § 241(a) who wilfully fails or refuses to depart "within a period of six months from the date of the final order of deportation under administrative processes, or, if judicial review is had, then from the date of the final order of the court * * * " When Congress, in 1961, gave the courts of appeals jurisdiction to review "final orders of deportation * * * made against aliens within the United States pursuant to administrative proceedings under section 242(b) of this Act or comparable provisions of any prior Act," it was thus using a term of art which had been used repeatedly in § 242 and possessed a well-understood meaning. We have already decided at least two such cases, Dentico v. I. N. S., 303 F.2d 137 (2 Cir. 1962), and Schoeler v. I. N. S., 306 F.2d 460 (2 Cir. 1962), where a "final order of deportation" was challenged, see also fn. 3 to Judge Clark's dissenting opinion.

Under the "prior Act[s]," 39 Stat. 889–890 (1917) and 43 Stat. 162 (1924), deportation, once determined, was gen-erally mandatory. However, Congress has supplemented the deportation provisions contained in such acts and in § 242 of the 1952 Act, by other provisions giving the Attorney General a wide gamut of discretionary withholding and dispensing powers. Section 243(h), 8 U.S.C.A. § 1253(h), authorizes him "to withhold deportation of any alien within the United States to any country in which in his opinion the alien would be subject to physical persecution and for such period of time as he deems to be necessary for such reason." Section 244(a), 8 U.S.C.A. § 1254(a), provides that he "may, in his discretion, suspend deportation and adjust the status to that of an alien lawfully admitted for permanent residence" in five different categories of cases.[1] Sections 244(b) and (c), 8 U.S. C.A. § 1254(b) and (c), direct that when the Attorney General has so suspended deportation, he is to report to Congress. In certain instances the Attorney General is to cancel deportation proceedings unless a house of Congress votes to the contrary; in others he is to deport unless Congress passes a concurrent resolution favoring suspension or if either house passes a resolution not favoring suspension. Finally § 244(e), 8 U.S.C. A. § 1254(e), authorizes the Attorney General "in his discretion" to "permit any alien under deportation proceedings," with certain exceptions, "to depart voluntarily from the United States * * * if such alien shall establish to the satisfaction of the Attorney General that he is, and has been, a person of good moral character for at least five years immediately preceding his application for voluntary departure * * *." A further dispensing power, subject to Congressional concurrence, is conferred by § 6 of the Refugee Relief Act of 1953, as amended, 50 U.S.C.A.Appendix, § 1971d.

■ The contrast between these sections giving the Attorney General discre-

---

1. In the last four of these categories, it is a condition to relief that the alien "has not been served with a final order of deportation issued pursuant to this Act in deportation proceedings up to the time of applying to the Attorney General for suspension of deportation."

tion to withhold or suspend the deportation of an alien found to be deportable, and § 242, relating to the determination of deportability, is marked. "The procedure outlined for a determination by the Attorney General or his delegate whether the alien, though subject to deportation shall have the order of deportation withheld, is a different matter," Milutin v. Bouchard, 299 F.2d 50, 51 (3 Cir. 1962), cert. granted and judgment vacated on consent of Solicitor General, 370 U.S. 292, 82 S.Ct. 1562, 8 L.Ed.2d 501 (1962). In fact, the withholding and suspending sections outline no procedure, let alone requiring use of the procedure prescribed by § 242(b), to which the 1961 judicial review amendment is keyed. Whereas a determination of deportability must rest on findings of fact sufficient to bring the alien under a specific provision of law, suspension "is in all cases a matter of grace," resting in the "unfettered discretion of the Attorney General", Jay v. Boyd, 351 U.S. 345, 354, 357–358, 76 S.Ct. 919, 924, 926, 927, 100 L.Ed. 1242 (1956). Nowhere do the withholding or suspension sections use the phrase of the 1961 Act, "final order of deportation" to characterize orders made thereunder, although § 244 does use it in explicit reference to deportation orders made under § 242(b); these sections speak instead of withholding, suspending, or cancelling deportation when the Attorney General exercises his discretion in favor of the alien, and of ultimately deporting the alien when he does not. When the Attorney General refuses to withhold or suspend deportation under these sections, he no more "affirms" the order of deportation than a parole board "affirms" a conviction or sentence when it denies parole, Jay v. Boyd, supra; neither can the former action be fitly described as "ancillary" any more than the latter could be.

So far as the statute itself is concerned, it would thus seem rather plain that the Attorney General's refusal to intervene with respect to a "final order of deportation" made under § 242(b) is not within the provision of the Act of 1961 for direct review of "final orders of deportation" by courts of appeals. To be sure, such orders may be nearer the end of the procedures an alien may invoke prior to deportation, but, were that the test, the warrant itself would be the "final order"—a position maintained by no one. When Congress, in 1961, defined its purpose by using a term having a meaning well understood in practice and repeatedly employed in the Immigration and Nationality Act itself, Congress must be taken to have adopted that meaning— at least in the absence of the clearest proof to the contrary. Yet, especially since the general command of the Administrative Procedure Act as to judicial review, 5 U.S.C.A. § 1009, excepts action which "is by law committed to agency discretion," it would seem in the last degree unlikely that Congress meant to require that a decision resting in executive grace, as to which the scope of any review is so narrow, must be initially reviewed by a court of three judges—a form of review of administrative action normally applied solely to "quasi-judicial" agency determinations made on a record available for the court's inspection, and only to some of those.

▇▇▇ Still the Service maintains here, and four of our brothers agree, that a discretionary decision by the Attorney General to do nothing to interfere with a "final order of deportation," a decision to which he is free to come without using the procedures of § 242(b), is itself a "final order of deportation" made pursuant to that section within the meaning of § 106(a). The argument hinges on administrative regulations and on legislative history.

When the 1961 Act was adopted, 8 C.F.R. § 244.1 provided that "Pursuant to Part 242 of this chapter and section 244 of the Act, a special inquiry officer in his discretion may authorize the suspension of an alien's deportation, or authorize an alien to depart voluntarily from the United States * * *" Section 242.8(a) authorized special inquiry officers "to determine deportability and to make decisions including orders of deportation

as provided by section 242(b) of the act," and also to exercise a variety of other powers. One of these was "to suspend deportation and authorize voluntary departure as provided by section 244 of the act." Determinations of special inquiry officers under Part 242 were final, § 242.20, save for certain review by the Board of Immigration Appeals.[2] Thus, says the Service here, when Congress enacted § 106 in 1961, it knew that the Attorney General had vested his dispensing powers under § 244 in the same special inquiry officer who, under § 242(b), was to "conduct proceedings * * * to determine the deportability of any alien," and therefore must have intended to include any "determination" made by the special inquiry officer against the alien among the orders made subject to review in the courts of appeals.

To us the "therefore" does not follow. When the 1961 amendment of the Immigration and Nationality Act spoke of "administrative proceedings under section 242(b) of this Act," it meant administrative proceedings which the Act required to be conducted under that section, not other proceedings for which the Attorney General happened to be prescribing the same format that day by regulation, although he could prescribe an altogether different one the next, as, indeed, he was then doing under § 243 (h). Moreover, it is only "final orders of deportation" which the Act makes reviewable in the courts of appeals—not any order resulting from use of the § 242(b) form of procedure. Cf. United States ex rel. Daniman v. Shaughnessy, 210 F.2d 564 (2 Cir. 1954).[3]

The Service argues that its construction would be convenient, would serve the Congressional purpose of dealing with "the growing frequency of judicial actions being instituted by undesirable aliens whose cases have no legal basis or merit, but which are brought solely for the purpose of preventing or delaying indefinitely their deportation from this country," H.R.Rep. No. 1086, 87th Cong., 1st Sess., in 2 U.S. Code Cong. & Adm. News (1961), p. 2967, and would comport with a Congressional intention "to create a single, separate, statutory form of judicial review of administrative orders for the deportation and exclusion of aliens * * *" id., p. 2966. When the

---

**2.** A different procedure was prescribed as to requests for withholding of deportation under § 243(h), 8 U.S.C.A. § 1253(h). These also were heard by a special inquiry officer; he forwarded a memorandum to the regional commissioner who made the final decision, 8 C.F.R. § 243.3 (b) (2).

**3.** Our brother Clark's opinion stresses that § 242(b) says the special inquiry officer "shall conduct proceedings under this section to determine the deportability of any alien, and shall administer oaths, present and receive evidence, interrogate, examine, and cross-examine the alien or witnesses, and, as authorized by the Attorney General, shall make determinations, *including* orders of deportation," apparently drawing the inference that Congress itself contemplated that the special inquiry officer would be delegated to make the discretionary determination confided to the Attorney General by later sections. The language does not support this—the purpose was to make clear that the authority of the special inquiry officer "included" the all important "final order of deportation," thereby dealing with the problem that had led to Wong Yang Sung v. McGrath, 339 U.S. 33, 70 S.Ct. 445, 94 L.Ed. 616 (1950), and its overruling by the Supplemental Appropriation Act of 1951, 64 Stat. 1048, which § 403(a) (47) of the 1952 Act in turn repealed, 66 Stat. 280. The House Report, 82nd Cong.2d Sess. No. 1365, makes it plain that the objective of § 242(b) was to establish "special procedures * * * for the determination of whether or not an alien is subject to * * * deportation, which proceedings are to be conducted before special inquiry officers specially qualified to conduct such proceedings and designated by the Attorney General pursuant to the provisions of the bill," U.S. Code Cong. & Adm.News, 1952, p. 1710. Not a word in the discussion of the relief provisions of § 244, pp. 1716–1721, refers to the special inquiry officers. Such powers as these officers now have, as to issues under §§ 243(h) or 244, derive, not from § 242(b), but from delegation by the Attorney General pursuant to the general permission conferred by § 103 (a), which he can alter at his pleasure.

special inquiry officer, in a single order, has made a final order of deportation under § 242(b), and has declined to suspend it or to authorize voluntary departure under § 244 and determinations under both sections are challenged, bifurcation of the road to review may indeed be inconvenient, and if that were the only case that could arise and nothing else stood in the way, it might be tempting to take whatever liberties with the language of § 106(a) were needed to avoid this. However, neither condition is made out.

This very case illustrates the common situation where, although determinations under both sections have been made by the special inquiry officer in a single disposition, deportability was conceded and the only challenge is to the determination under § 244.[4] The likelihood of reversal in such a case, after the decision, in Jay v. Boyd, supra, that "there is nothing in the language of § 244 of the Act upon which to base a belief that the Attorney General is required to give a hearing with all the evidence spread upon an open record with respect to the considerations which may bear upon his grant or denial of an application for suspension to an alien eligible for that relief," 351 U.S. p. 353, 76 S.Ct. p. 924, that "suspension of deportation is not given to deportable aliens as a right, but, by congressional direction, it is dispensed according to the unfettered discretion of the Attorney General," pp. 357–358, 76 S.Ct. pp. 926, 927, and that the statute permits "decisions based upon matters outside the administrative record, at least when such action would be reasonable," p. 358, 76 S.Ct. p. 927, matters which a reviewing court cannot know but of whose existence it must take account, is minimal. Yet, on the Service's construction, an admittedly deportable alien like petitioner may, by filing a petition for review, be entitled to the privilege, hitherto narrowly confined, of having his attack initially considered by three judges, and may obtain an automatic stay unless the court of appeals "otherwise directs," and this despite the provision in § 106(a) (7) that "nothing in this section shall be construed to require the Attorney General to defer deportation of an alien after the issuance of a deportation order because of the right of judicial review of the order granted by this section * * *." Such a view scarcely comports with the Congressional purpose of expedition. Where the challenge is simply to the Attorney General's refusal to exercise a dispensing power, the Congressional purpose would be better served by leaving the Attorney General free to deport unless a district court halts him, action that should be rather rare in view of the narrow scope of review, than by stretching the language to encompass the review of such orders in the courts of appeals, with an automatic stay, particularly when we take into account that, unlike the district courts, the courts of appeals are not continuously in session and may be far removed from the scene of action.

Furthermore, extending our jurisdiction to such orders would not in fact "create a single, separate, statutory form of judicial review." Section 106(a) (5) creates one exception; when a genuine issue of United States nationality is presented, the court of appeals must "transfer the proceedings to a United States district court for the district where the petitioner has his residence for hearing de novo of the nationality claim and determination as if such proceedings were originally initiated in the district court under the provisions of section 2201 of Title 28." Our brother Clark's opinion indicates another. After an automatic stay and ultimate adverse decision by us, the deportee, unless he voluntarily departs, can have another although more limited fling in the district court, by habeas corpus, once he is taken into detention.[5] Again, a proceeding in the

---

4. This is also the situation in Ng Yen v. Immigration and Naturalization Service, 308 F.2d 796.

5. We are unable to follow an argument that judicial expansion of the phrase "final orders of deportation" in § 106(a)

court of appeals under § 106 affirming a determination of deportability and a denial of suspension will surely not prevent a subsequent action challenging the Attorney General's selection, under § 243 (a), 8 U.S.C.A. § 1253(a), of a country to which the alien is to be deported. Is this too a "final order of deportation" reviewable under § 106? Are there then two "final orders," and when do the six months of § 106(a) (1) start to run? It would seem more rather than less convenient that, where the challenge is not to deportability, proceedings both before and after detention should be in the district court, especially since the instances where the district court will enjoin either detention or deportation, or a court of appeals will grant a stay on an appeal from an adverse decision, will be exceedingly few.[6]

The construction urged by the Service encounters other difficulties, which suggest that even though the dictionary is not to be made a fortress, as our brothers remind us, reading Congressional language to mean what it says, particularly when Congress has used a technical term, although perhaps old-fashioned, may not be always and altogether ill-advised. On the view taken by the Service here, was jurisdiction conferred on the courts of appeals only as to denials of suspension under § 244(a) or also as to denials of withholding under § 243(h)? As the regulations stood when Congress acted, it would be hard to sustain the latter under the Service's theory, since the determination was made, not by the special inquiry officer who alone is named in § 242(b) but by the regional commissioner; yet the situations are so much alike that a construction including one and excluding the

other would scarcely be rational. Since then the regulations have been amended, 26 F.R. 12113 (Dec. 19, 1961), so that the special inquiry officer—Board of Immigration Appeals procedure prevails also under § 243(h). We do not question the power of the Attorney General thus to alter the procedure under § 243(h), but it would be rather novel that an administrative regulation could bring something within the jurisdiction of the courts of appeals which was not covered by the language that Congress used and which, having given today, the Attorney General can take away tomorrow, as, indeed, he can do under § 244. Also there will be cases when questions under § 243(h) will arise only after the Attorney General has selected a particular country under § 243 (a), and that may be more than six months after the final order under § 242 (b). Then there is the case where the grievance is the refusal to reopen a deportation proceeding to permit an application for suspension to be filed, see Wolf v. Boyd, 238 F.2d 249 (9 Cir.), cert. denied, 353 U.S. 936, 77 S.Ct. 814, 1 L.Ed. 2d 759 (1957). Is such an order also a "final order of deportation"? Again, what of decisions denying voluntary departure? These also were made "pursuant to administrative proceedings conducted under section 242(b)," 8 C.F.R. § 244.1. It seems hard to sustain that an order of a special inquiry officer denying suspension comes within § 106(a) whereas one made in the same proceeding denying voluntary departure is not; yet it is quite incredible that Congress meant to burden courts of appeals with review of orders of the latter sort, even though the grant of voluntary departure means that the order of deportation is not executed, with consequent benefit to the alien.

is needed to trigger § 106(c) limiting the scope of subsequent habeas corpus; that section would apply equally if petitioners like Foti and Ng Yen had sued in the district court.

6. The argument for the broad construction of § 106(a) seems to rest, in considerable part, on the inarticulate premise that all deportation suits are appealed, with stays generally granted. We know

of no factual basis for this predicate. The 1961 Annual Report of the Director of the Administrative Office of the United States Courts shows, Table C 3, that during the fiscal year ending June 30, 1961 (the last complete year before the 1961 Act took effect), a total of 162 deportation cases were commenced in the district courts of the Second Circuit. During the same period our own docket of appeals in deportation cases did not exceed 15.

With expansion of the statute beyond the natural meaning of its words creating such problems, such a construction would require clear evidence from legislative history that this was the intent. But the inferences from the House Report against a construction going beyond the words are at least as strong as those for it. The letters of Deputy Attorney General Walsh and Deputy Attorney General White (as he then was) and the quoted testimony of the Assistant Attorney General heading the Criminal Division, supra, pp. 2968–2970, recommending the legislation, refer only to deportation orders in the technical sense and the Supreme Court decisions upholding their reviewability, Brownell v. Rubinstein, 346 U.S. 929, 74 S.Ct. 319, 98 L.Ed. 421 (1954), and Shaughnessy v. Pedreiro, 349 U.S. 48, 75 S.Ct. 591, 99 L.Ed. 868 (1955); no reference was made to the decisions, surely well known to the Department, dealing with reviewability of orders declining to suspend deportation, United States ex rel. Accardi v. Shaughnessy, 347 U.S. 260, 74 S.Ct. 499, 98 L. Ed. 681 (1954); Jay v. Boyd, 351 U.S. 345, 76 S.Ct. 919 (1956). The Committee said it was not concerned over cases like Foti's or Ng Yen's; "The alien whose sole immigration offense is, perhaps, a defect in his visa, or an over-extended stay as a visitor, usually accepts the order of deportation and departs," p. 2967. The concern was over "subversives, gangsters, immoral, or narcotic peddlers" who use their "ill-gotten gains" in repetitive resistance to deportation orders. The sentence from the Report quoted by our brother Clark seems to point to a conclusion opposite to what is drawn from it; we should suppose the desire to give "the alien greater rights, greater security, and more assurance of a close study of his case by experienced judges," 2 U.S.Code Cong. & Adm.News (1961), p. 2972, was more readily relatable to the determination of deportability, which is "as carefully guarded as any other piece of contentious litigation," Milutin v. Bouchard, supra, and there is thus something for judges to study, than to the discretionary decision of the Attorney General whether to withhold or suspend deportation or permit voluntary departure, as to which judges have so narrow a function to perform.

Neither do we find a sufficient basis for stretching the language in the discussion when a similar bill passed the House in 1959, 105 Cong.Rec. 12728. Representative Lindsay was concerned that the six months given an alien to seek judicial review should not begin to run "if there is any remedy on the administrative level left of any nature"; Representative Walter assured him this was so, "The final order means the final administrative order." Representative Lindsay returned to the charge when Representative Moore was speaking for the bill, and again sought and obtained assurance "that the words 'final deportation order' does not take effect until after determination of the question of suspension." Finally, Mr. Walter, in a further effort to satisfy Mr. Lindsay, added "that the 6th months' period on the question of finality of an order applies to the final administrative adjudication of the application for suspension of deportation just as it would apply to any other issue brought up in deportation proceedings." We do not read this as indicating a view by Representative Walter that denial of an application for suspension was itself to be reviewable in a court of appeals. Representative Lindsay's concern was that the six months' period for challenging the deportation order should not start to run while departmental proceedings involving suspension were still going on. Representative Walter's assurance to him was well-founded, since proceedings before the Board of Immigration Appeals on an appeal from a denial of suspension toll the date of the final deportation order which initiates the six months' period of § 106(a) (1), 8 C.F.R. § 6.14, see also § 106(c). Moreover, even if what was said were more probative than it is, a remark made in the course of debate, heard, in all probability, by only a few members of one house, two years before a bill's final passage, should not overcome

clear statutory language. We have been appropriately warned against "safaris into legislative documents that succeed only in flushing a phrase here and a sentence there whose connection with the will of Congress is questionable at best," Bok, The Tampa Electric Case, 1961 Supreme Court Review, 267, 290.

Much more compelling than such dubious inferences from legislative history are considerations, not yet mentioned, arising from § 106(a) (4). This says that, with an exception not here material, the judicial review confided to the courts of appeals by § 106 "shall be determined solely upon the administrative record upon which the deportation order is based and the Attorney General's findings of fact, if supported by reasonable, substantial, and probative evidence on the record considered as a whole, shall be conclusive". This is the standard long applied in the review of final orders of deportation under § 242(b); Congress' direction that the courts of appeals should apply that standard is rather clear evidence that it was such orders, and only such, whose review by them was contemplated. This standard differs from that in reviewing the refusal to withhold or suspend deportation in two vital respects, already noted. In suspension and withholding proceedings, the Attorney General may find facts and consequently exercise discretion on the basis of confidential information not in "the administrative record."[7] Judicial review must take into account the possibility that the Attorney General has relied on such extra-record material, Jay v. Boyd, supra, at 358, 76 S.Ct. at 927, as has been regularly done in the cases under § 243(h), United States ex rel. Dolenz v. Shaughnessy, 206 F.2d 392, 395 (2 Cir. 1953); Diminich v. Esperdy, 299 F.2d 244 (2 Cir. 1961), cert. denied, 369 U.S. 844, 82 S.Ct. 875, 7 L.Ed.2d 848 (1962). Moreover, since a suspension or withholding of deportation "is a dispensing power, like a judge's power to suspend the execution of a sentence, or the President's to pardon a convict," Judge L. Hand in United States ex rel. Kaloudis v. Shaughnessy, 180 F.2d 489, 491 (2 Cir. 1950), quoted with approval in Jay v. Boyd, supra, at 354, 76 S.Ct. at 924 fn. 16, the rule has been that denial may not be set aside merely because unsupported "by reasonable, substantial, and probative evidence on the record considered as a whole," but only "when an alien has been denied appropriate procedural due process or a fair consideration of his application," United States ex rel. Moon v. Shaughnessy, 218 F.2d 316, 318 (2 Cir. 1954), or where "it affirmatively appears that the denial has been actuated by considerations that Congress could not have intended to make relevant." United States ex rel. Kaloudis v. Shaughnessy, supra; United States ex rel. Hintopoulos v. Shaughnessy, 233 F.2d 705, 708 (2 Cir. 1956), aff'd 353 U.S. 72, 77 S.Ct. 618, 1 L.Ed.2d 652 (1957). Yet, if orders withholding or denying suspension or denying voluntary departure have been made reviewable by § 106(a), the standard of review must now be that provided in § 106(a) (4), unless we are to apply further surgery to the statute,[8] as

---

7. A different rule may apply as to the preliminary determination of eligibility, see Jay v. Boyd, supra, at 352, 76 S.Ct. at 923.

8. Evidently disturbed by the consequences to which its position as to the scope of § 106(a) leads, the Service argues in its brief in Ng Yen v. Immigration and Naturalization Service, 308 F.2d 796 that § 106(a) (4) should not be read as prescribing the standard for review in all cases made originally reviewable in the court of appeals but only when that would have been the standard heretofore appropriate. In effect, it would rewrite § 106(a) (4) to read "the petition shall be determined solely upon the administrative record upon which the deportation order is based *except insofar as the Attorney General was previously permitted to consider facts outside the administrative record, in which event the court shall take into consideration the possibility that his determination may be supported by such facts*, and the Attorney General's findings of fact shall be conclusive if these are supported by reasonable, substantial, and probative evidence *or meet any lesser requirement*

our brothers apparently would. Since it is scarcely to be supposed that Congress meant to overturn the well-established principles governing the review of such orders and to elevate the alien's substantive rights in such cases to the same plane as exists for orders determining deportability, this is further and rather compelling evidence that the statute does not extend to them.

Thus we are unable to follow the decisions in the Seventh Circuit, cited by our brothers, Blagaic v. Flagg, 304 F.2d 623 (1962) and Roumeliotis v. I. N. S., 304 F.2d 453 (1962), upholding jurisdiction of the court of appeals, in one case over the Attorney General's refusal to withhold deportation under § 243(h) and in the other over his denial of a first preference immigrant visa under § 203(a) (1) (A), 8 U.S.C.A. § 1153(a) (1), despite objections there made by the Service. Indeed, the latter decision shows how very far from "final orders of deportation" the phrase "ancillary" will lead. And the triviality of the grounds urged on the merits in the two cases in the Seventh Circuit, as in the two here, adds point to our belief that Congress could not have meant to require three judges to pass upon such petitions. We find far more persuasive the thorough and well-reasoned opinion of Judge Edelstein in Zupicich v. Esperdy, 207 F.Supp. 574 (S.D.N.Y. 1962), which also called attention to two decisions in the Ninth Circuit, Giova v. Rosenberg, 308 F.2d 347 (1962), and Mai Kai Fong v. Immigration and Naturalization Service, 305 F.2d 239 (1962); but see Louie King Fong v. Immigration and Naturalization Service, 308 F.2d 191 (1962).

Although the Federal scheme for the review of administrative orders may not be a model of symmetry, see Gellhorn & Byse, Administrative Law, Cases and Comments (1960), pp. 218–223, it was generally true, until the Act of September 26, 1961, that only the orders of the independent regulatory commissions came initially before courts of three judges.[9] Orders relating to immigration matters, like those relating to naturalization, social security and railroad retirement benefits, veterans' insurance, and others, dealing with matters of great concern to an individual but not affecting the general public interest and unlikely to have important precedential effect, were left to review by a single district judge, more conveniently accessible to the parties, whose ruling might be appealed if the losing side were so advised. Because of a belief that any departure from this scheme was unwise, Representative Lindsay, in voting for the amendment, expressed the hope "that the Judicial Conference of the United States will conduct an early review of the operation of this procedure, if adopted, in order to make available to us its findings as to the administrative viability of the provision" with respect to the courts of appeals, 105 Cong.Rec. 12719 (1959). While the courts of appeals should give full effect to the change in pattern made by the Act of September 26, 1961, with respect to "final orders of deportation," they should not be astute to attribute to Congress a purpose to require them also to review in the first instance discretionary orders refusing to suspend or withhold deportation or to permit voluntary departure or to grant visas—a result that would represent a further deviation from the established pattern, would go beyond the fair intendment of the words that Congress used, and, by imposing on the courts of

---

*existing before enactment of this act."* We think this too radical surgery for a court to perform—especially when any need for the operation can be avoided by the simple therapy of reading "final orders of deportation" to mean "final orders of deportation," in which event § 106 (a) (4) fits perfectly.

9. The sole apparent exception, the review of certain orders of the Secretary of Agriculture under the Packers and Stockyards Act, 1921, as amended, 7 U.S.C.A. § 181 et seq., and the Perishable Agricultural Commodities Act, 1930, as amended, 7 U.S.C.A. § 499a et seq. 5 U.S. C.A. § 1032(b), is hardly a real one; under such acts the Secretary exercises functions altogether similar to those of a regulatory commission.

appeals a quantity of petitions presenting no truly justiciable issue, would impair the "viability" of the new legislation.

The petition is dismissed for want of jurisdiction.

CLARK, Circuit Judge, with whom Judges WATERMAN, MOORE, and SMITH join (dissenting).

In our view our majority brethren have chosen to adopt an interpretation of statutory language which is both artificially literal and highly inappropriate to the actual situation; in so doing they have frustrated the legislative purpose and have saddled the litigants and the courts with a complicating, overlapping, and delaying additional form of deportation review. It is not without irony that a carefully formulated program fashioned over the years by Congress to provide a simple and complete form of review in this important area, comparable to that provided for the other administrative agencies, should result under judicial surgery in only adding delay and confusion to existing methods of review. As we expect to demonstrate, this is by no means a compelled result and we are at a loss to understand why it has been selected. None of the parties here or in the companion case of Ng Yen, 308 F.2d 796, have sought or now seek this result, and we expect that they will be as surprised and disturbed by this unexpected outcome as are we.

Before we turn to this demonstration we should note the strong current of judicial opinion in accord with our and the parties' view. In this case Senior Judge Hincks and the writer—comprising with Judge Friendly the panel assigned to hear the petition for review—joined in an opinion for affirmance on the merits; Judge Friendly dissented and sought and obtained an order under 28 U.S.C. § 46(c) for further proceedings *in banc* before only the active judges. In Ng Yen the entire panel, consisting of Judges Waterman and Moore and the writer, joined in an opinion also for affirmance on the merits when we were met by the order for *in banc* proceedings. Thus the judges of our court who have considered the issue are equally divided, five to five; only the accident of a poorly worded statute (probably soon to be corrected) prevents Judge Hincks' vote from being officially recorded.[1] Elsewhere our view has the support of two well reasoned decisions by Seventh Circuit panels, Blagaic v. Flagg, 7 Cir., 304 F.2d 623, and Roumeliotis v. Immigration and Naturalization Service, 7 Cir., 304 F.2d 453, and of a Ninth Circuit decision, Louie King Fong v. Immigration and Naturalization Service, 9 Cir., 308 F.2d 191,[2]

1. See United States v. American-Foreign S.S. Corp., 363 U.S. 685, 690, 80 S.Ct. 1336, 4 L.Ed.2d 1491 n. 7, referring to the amendment of 28 U.S.C. § 46(c), recommended by the Judicial Conference of the United States. 1959 Ann.Rep. 9–10. See also 1961 Ann.Rep. 77.

2. Our brothers also cite two other decisions of Ninth Circuit panels, which, however, are of uncertain import because of lack of discussion of the issue before us. We understand that in at least one of them time has been extended for the filing of a petition for rehearing. In Giova v. Rosenberg, 9 Cir., 308 F.2d 347, the court declined jurisdiction to review a denial of a motion to reopen deportation proceedings before the Board of Immigration Appeals where the deportation order had been entered over four years earlier. Since a timely petition to review such a denial of a motion to reopen is surely within our jurisdiction—as, indeed, we held in Dentico v. Immigration and Naturalization Service, 2 Cir., 303 F.2d 137—the difficulty would appear to concern the long delay. See 8 U.S.C. § 1105a(a) (1). In Mai Kai Fong v. Immigration and Naturalization Service, 9 Cir., 305 F.2d 239, a similar situation of delay obtained and a like ruling was made, based, however, upon the two reasons that the matter had already been adjudicated in the District Court for the District of Columbia and that the petitioner had failed to exhaust his administrative remedies. Involved also were denials of applications for a stay which were held also settled by the earlier adjudication. Alternatively it was stated—in the only ruling here pertinent —that these denials were not reviewable as final orders of deportation; this ruling was made merely citing the doubtful Giova case without discussion.

accepting without question a transfer from the district court, as required by § 5(b) of P.L. 87–301, 8 U.S.C. § 1105a. (See Dentico v. Immigration and Naturalization Service, 2 Cir., 303 F.2d 137.) There are also like decisions from the court below (to which these cases are presumably being remitted if new actions can be or are started), including a ruling in Foti's own action heretofore dismissed.[3]

Against this strong body of precedent our brothers are forced to seek support in a decision by Judge Edelstein in Zupicich v. Esperdy, D.C.S.D.N.Y., 207 F. Supp. 574, made apparently before the contrary decisions in his own court referred to in our note 3, wherein the learned judge makes a ruling going somewhat along the way traveled by our brothers, though not so far. For he expressly refuses to pass upon a case arising under the new regulations of the Attorney General (discussed below and in the majority opinion) implementing and enforcing a unitary deportation procedure. But so far as the opinion goes, it shows a like hiatus in argument, as it starts with an initial stress upon the legislative intent to develop a simple complete system of review, as set forth in the Administrative Procedure Act, 5 U.S.C. §§ 1031–1042, and explicitly incorporated into our governing statute, 8 U.S.C. § 1105a(a), and then proceeds to an interpretation of the statute which sets at naught the intent thus uncovered.

Why this is so and why our result is so confusing will become clear upon examination of the pertinent background. The Immigration and Nationality Act of 1952 contained provisions of an humanitarian nature authorizing the Attorney General to withhold deportation of an alien to a country where he would be subject to physical persecution, 8 U.S.C. § 1253(h), and, in certain specified cases of hardship to himself and family, to suspend deportation of an alien and adjust his status to that of one lawfully admitted for permanent residence, 8 U.S.C. § 1254(a) (1)-(5). As was obvious and, indeed, intended, these provisions have become of the utmost importance in deportation cases; and in an increasingly large number of cases, applications for withholding or suspension of deportation have been made and review of their denial has been sought in the courts. Consideration of such denials has become a major part of our activity in the deportation field and from the nature of things is likely to increase rather than otherwise. For these remedies afford a way of obtaining a temporary stay and under appropriate conditions a permanent status as resident of an alien who has no other legal ground for relief; the two cases here before us where the petitions had necessarily to admit deportability are good examples of the importance which this discretionary relief has now assumed. True, the legislative intent is to make this an executive, rather than a judicial, function, so far as possible, as indeed is its attitude with respect to immigration matters generally. But even though judicial assistance is not easily obtained, it is natural, in view of the stakes, that it should be regularly and persistently sought. It is not conceivable that these well known facts were not

---

3. Of the eleven cases already transferred to our court pursuant to § 5(b) of P.L. 87–301, 8 U.S.C. § 1105a, it appears that six involved only deportability, while the other five raised either solely or additionally issues of suspension or other relief. In Walters v. Esperdy, D.C.S.D. N.Y., 209 F.Supp. 664, a suspension case, Judge Bryan wrote a memorandum opinion Dec. 18, 1961, and filed his order of transfer Jan. 18, 1962. He said in his discussion that, while the question is not free from doubt, yet the defendant had shown enough to justify transfer at this juncture and afford this court opportunity to pass on the question of its own jurisdiction. In the present case Foti's petition for review was filed, after dismissal upon consent, of his action below in the Southern District of New York after Judge Murphy had refused a preliminary injunction on the ground that the District Court no longer had jurisdiction of the action. Thus after a rather dizzy runabout, Foti now finds himself back where he started, but with a consent judgment against him.

known to the sophisticated subcommittee on Immigration and Nationality of the House Judiciary Committee and its Chairman, Representative Walter, who have sponsored all the important legislation in this field. And it would be strange, indeed, if in their 1961 legislation as to review they conspicuously omitted any provision for this now vastly important aspect of deportation litigation.

Actually the history of the 1961 legislation shows pretty conclusively that there was no such omission. Improvement in the form of deportation review had been under consideration for some time. As early as 1954 the Attorney General had proposed legislation similar to that eventually passed, and bills in fact passed the House in 1958, 1959, and earlier in 1961. This history is traced in a perceptive Comment, Deportation and Exclusion: A Continuing Dialogue between Congress and the Courts, 71 Yale L.J. 760–792 (1962). In all the legislative activity there was expressed the purpose of reducing the existing complicated procedure to a simple system of direct review by the courts with decisive power, namely, the courts of appeals. Particularly stressed was the need to prevent the long delays possible under existing procedure "by repetitive appeals to the busy and overworked courts." H. R. Rep. No. 1086, 87th Cong., 1st Sess., Aug. 30, 1961, to accompany S. 2237, 2 U.S. Cong. & Adm. News (1961) 2950, 2967, and see also H. R. Rep. No. 565, 87th Cong., 1st Sess. (1961); 71 Yale L.J. 760 n. 4 (1962). This is empasized by the strong support given the proposed legislation from President Eisenhower (who called for its enactment in 1956 and 1957, 2 U.S.Cong. & Adm.News, supra, 2967, 2968) through the Department of Justice (Letters of Deputy Attorney General Walsh and of Deputy Attorney General White, March 30, 1959, and April 18, 1961, 2 U.S.Cong. & Adm.News, supra, 2968–2969) to the Judicial Conference of the United States, which endorsed the various bills on several occasions. 1959 Ann.Rep. of the Proceedings of the Jud.Conf. of the U.S. 8; 1960 Ann.Rep. 30, 31; 1961 Ann.Rep. 18, 78, 79 (meetings of March and Sept. 1961).[4]

The legislative committees, recognizing that the right of habeas corpus must be preserved, as it is in 8 U.S.C. § 1105a(a) (9), took steps reasonably designed to carry out their intent consistent with this preservation. Thus the statute provides that no deportation order shall be reviewed unless the alien has exhausted his administrative remedies, that every petition for review or for habeas corpus must state whether the order had been upheld in any prior judicial proceedings, and, if so, the circumstances, and that no such petition shall be entertained if the order's validity had been sustained in any prior judicial proceeding unless it presents grounds which the court finds could not

---

4. Thus see 1959 Ann.Rep. 8:

"(3) *H.R. 2807, 86th Congress, to authorize a new type of judicial review of administrative orders for the deportation of aliens from the United States, which, except as to aliens in custody, would be exclusive.*—This proposal would permit an alien to file a petition for the review of a deportation order in a United States Court of Appeals within six months from the date of the final order. In so doing, the bill implements and applies Section 10 of the Administrative Procedure Act, and, with some exceptions, makes the procedure of the Hobbs Act (5 U.S.C. 1031 et seq.) applicable to the judicial review of deportation orders. The review would be had upon the administrative record upon which the order was based, and the Attorney General's findings of fact, if supported by reasonable, substantial and probative evidence on the record considered as a whole, would be conclusive. The right of any alien in custody to petition for a writ of habeas corpus would be preserved. The Committees [on Court Administration and Revision of the Laws] stated that the proposal is intended to do away with delays which heretofore had been encountered as a result of repeated litigation in deportation proceedings, some of which had been carried on for many years. On recommendation of the Committees, the Conference approved the bill."

The later reports cited referred back to and reiterated this approval.

have been presented in the earlier proceedings or that remedy was inadequate or ineffective to test the validity of the order, 8 U.S.C. § 1105a(c). All review must be upon the administrative record before the Attorney General unless an issue which is not frivolous is made as to nationality, when the case may be remitted to a district court for hearing *de novo* on this issue of fact, 8 U.S.C. § 1105a(a) (4) (5). And a limitation is set upon petitions for review of six months from the date of the final deportation order or the effective date of the statute (Oct. 26, 1961). 8 U.S.C. § 1105 a(a) (1).

This carefully devised legislation is superimposed upon already existing law providing for extensive departmental hearings before hearing officers under procedure in accordance with regulations to be prescribed by the Attorney General. "The procedure so prescribed shall be the sole and exclusive procedure for determining the deportability of an alien." 8 U.S.C. § 1252(b) (4). As showing the absence of limitation on the inquiry officer's authority the first sentence of this subdivision is significant: "A special inquiry officer shall conduct proceedings under this section to determine the deportability of any alien, * * * and, as authorized by the Attorney General, shall make determinations, *including* orders of deportation." (Italics supplied.) 8 U.S.C. § 1252(b).[5] Pursuant to the authority given, the Attorney General has adopted regulations providing in detail for the initiation of proceedings before the special inquiry officer down through an appeal to the Board of Immigration Appeals and carefully safeguarding the procedural rights of the alien. 8 CFR § 242.1 et seq. Secs. 242.8 and 242.17, adopted in 1957 and extended by amendment Dec. 19, 1961, give the inquiry officer full authority to hear and determine

all these applications for discretionary relief we are now considering, and § 242.17(d) as now amended provides: "An application under this section [i. e., for all the various types of discretionary relief here specified] shall be made *only during the hearing* and shall not be held to constitute a concession of alienage or deportability in any case in which the respondent does not admit his alienage or deportability." (Italics supplied.) And by § 242.18 the decision of the special inquiry officer is required to include a discussion of the evidence and findings as to deportability and of the evidence pertinent to any application for discretionary relief under § 242.17 and the reasons for granting or denying the relief. "The decision shall be concluded with the order of the special inquiry officer."

Thus the Attorney General has recognized and reenforced the unitary nature of the entire deportation proceeding in regulations which have the force and effect of law. United States ex rel. Accardi v. Shaughnessy, 347 U.S. 260, 265, 74 S.Ct. 499, 98 L.Ed. 681. Obviously it will be most difficult and inconvenient to disentangle and divide up the inquiry officer's one decision and order so that it may be subjected to different forms of piecemeal review. Our brothers have no suggestion as to how this difficulty will be met. There are other difficulties they do not discuss arising from the six months' time limitation and the requirement that all administrative remedies be satisfied. Suppose an alien against whom a deportation order has been entered wishes to seek its reopening for the consideration of some new evidence and also to ask for hardship relief. According to the provisions just discussed he must ask for both together and before filing his petition for review, though meanwhile the

---

5. These provisions make doubly significant the venue of the new petition for review "in the judicial circuit in which the administrative proceedings before a special inquiry officer were conducted *in whole or in part*" (italics supplied), or in the circuit of the petitioner's residence, but not in more than one. 8 U.S.C. § 1105a(a) (2). Obviously the legislative committees knew the parts into which the deportation proceedings may divide. And the implication of a single unitary review is obvious.

·six months' period of limitation is apparently running against him. His situation may well be precarious. See 71 Yale L.J. 760, 762–764 (1962) and the extract therefrom quoted in note 7 *infra*. Of course none of these difficulties arise under the view we are supporting.

The interpretation which our brothers find necessary rests at bottom upon four statutory words, viz., "final orders of deportation," and in last analysis is only an interpretation of "final." [6] This phrase occurs in 8 U.S.C. § 1105a(a) referring back to 8 U.S.C. § 1252(b), ·which we have already cited. There is nothing in this latter statute which expressly excludes the interpretation we make; indeed there is support for it, as we have stated. Moreover we believe the practicalities and natural analogies point that way. Involved here are decisions on applications to suspend or stay the operation of the deportation order. When a like application is made as to a "final judgment" in an ordinary civil action, the judgment is naturally stayed until the application is disposed of. F.R. 73(a); and see Leishman v. Associated Wholesale Electric Co., 318 U.S. 203, 63 ·S.Ct. 543, 87 L.Ed. 714. As is well understood, here included are a wide variety of motions, such as those to make ·or amend findings, to alter and amend the judgment, and for a new trial. Consideration of these motions does not impugn the settled regard for finality of judgments in civil procedure; it is indeed difficult under the statutory language and even more under the practical ·compulsion of all the present circumstances to see why that analogy is not persuasive here. Perhaps the situation could not be more neatly put than in the following quotation from Blagaic v. Flagg, supra, 7 Cir., 304 F.2d 623, 625: "If the withholding of deportation is ·not granted, petitioner will be deported;

thus, in a realistic sense the denial of a stay is a part of the deportation order."

Our brothers finally resort to the "old-fashioned," but hoary and illusory, principle of "reading Congressional language to mean what it says." "But it is one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of the dictionary," said our late great colleague Learned Hand in a famous passage, Cabell v. Markham, 2 Cir., 148 F.2d 737, 739, quoted in Markham v. Cabell, 326 U.S. 404, 409, 66 S. Ct. 193, 195, 90 L.Ed. 165, affirming the decision below. This admonition seems particularly in point as to matters of procedural detail, which are only a means to an end where rigid formalism tends to defeat their own purpose, and not an end in themselves. Here the announced principle seems meaningless. It is doubtful if a layman without personal experience would know what "deportation" legally signifies; and if he had knowledge, he would hardly assume that the "proceedings" were at an end before the now so important steps to secure discretionary relief are begun. And as we have pointed out, to a lawyer a final judgment does not mean what it is here made to mean. Our brothers also refer to a variety of makeweight considerations which for the most part are not established and even if established would not weigh against the Congressional intent. We are given no figures as to the volume of litigation, present or prospective; in view of the delay now so easily to be secured by pressing steps under the divided procedure here forced upon us, it seems hardly doubtful but that our appellate work will be sharply increased, rather than otherwise. Whatever nuances of legal principle may distinguish the review of the order of deportation from that of denials of discretionary relief, certainly experienced circuit judges may work out the law as easily where en-

---

6. If there is, indeed, compulsion in this word or phrase, it would seem to press in the opposite direction from that taken by our brothers, namely, to the really ultimate step, the issuance of the final

warrant commanding deportation. But, presumably because of the obvious unworkability of this meaning in the general statutory setting, no one appears to support this view.

try to their court has been by way of petition for agency review as where it has been by appeal from the district court. And the desire to give "the alien greater rights, greater security, and more assurance of a close study of his case by experienced judges," 2 U.S. Cong. & Adm.News (1961) 2972, would seem to apply as much to the orders now under consideration as to any others in view of the great importance that they now have in deportation proceedings. All this seems quite unpersuasive.

We have referred to the legislative history, which is convincing as to the view we are stating. But yet to be recounted is one item which is quite conclusive as to the legislative intent. That is the colloquy on the floor when the legislation passed the House in 1959. That colloquy is fairly recounted by our brothers in their opinion, although they attempt to discredit its meaning and effect. But such discrediting does not seem possible. Recall the participants: Chairman Walter, the legislative leader in all this area; his assistant and committee reporter, Congressman Moore; and, asking the important questions, Representative Lindsay, who was thoroughly cognizant of the problem by having represented the government in Jay v. Boyd, 351 U.S. 345, 76 S.Ct. 919, 100 L. Ed. 1242—the now controlling case as to review of this type of orders. Recall also the repeated assurances that "The final order means the final administrative order," and that the " 'final deportation order' does not take effect until after determination of the ques-

tion of suspension," with the ultimate statement of Chairman Walter himself "that the 6 months' period on the question of finality of an order applies to the final administrative adjudication of the application for suspension of deportation just as it would apply to any other issue brought up in deportation proceedings." 105 Cong.Rec. 12728. It was on this assurance that the bill was passed. Here literally the words must mean what they say, as an informed commentator concludes, 71 Yale L.J. 760, 763, 764 n. 20 (1962),[7] and we are content to accept and act on this view.

Indeed our brothers' attempt to dull the impact of these enlightening responses is decidedly forced. Thus they imply that the legislators were avoiding the difficulty of the imposed statute of limitations by holding the six months' period for filing the review petition only suspended or erased by the filing of the application for discretionary relief. That is far from what the legislators said; and the results of such a statutory interpretation would surely be dubious and bizarre. Consider the example instanced above of a filing of a joint motion to reopen and application for discretionary relief. As we have seen, denial of the motion must go to the court of appeals, Dentico v. Immigration and Naturalization Service, supra, 2 Cir., 303 F.2d 137, while denial of the application is now to be reserved for district court action. How long are the proceedings to be held in abeyance by these procedural steps? Suppose the motion and application are filed a day before the expiration

7. "Section 1(a) (1), H.R. 187, 75 Stat. 651 (1961), 8 U.S.C.A. § 1105a(a) (1) (Supp. 1961). H.R. 187 allows six months from the date of the final deportation order in which to bring a petition for review. The determination of when an order becomes final has always been important because of the need to exhaust administrative remedies before seeking judicial review, a requirement retained in section (c) of the bill, 75 Stat. 653 (1961), 8 U.S. C.A. § 1105a(c) (Supp.1961). The determination of finality is made vital by the combination of the statute of limitations and the requirement of exhausting administrative finality. During the House debate on H.R. 2807, 86th Cong., 1st Sess. (1959), the author, Representative Walter, and the committee reporter, Representative Moore, agreed to a statement by Representative Lindsay that 'if there is any remedy on the administrative level left of any nature, that the deportation order will not be considered final.' 105 Cong.Rec. 12728 (1959). It was also stated that 'final' meant after a determination of suspension of deportation. Ibid. * * * " 71 Yale L.J. 760, 763, 764 n. 20 (1962).

of six months after the entry of the deportation order and are not determined for, say, a year. Does the alien then still have time to file his review petition? If so, does he have six months or only a day in which to act? And when should he institute his district court action? On these matters, where in all fairness the alien should have clear expression of and timely warning as to his rights, the answers would be left hopelessly obscure. And the opportunities for delay and special treatment if the alien times his moves shrewdly are obvious.

Again our brothers guess—with no real knowledge—that only a few members of the House were present to hear the colloquy. We question the propriety of thus attempting to impugn the action of a co-ordinate arm of government; in any event the observation even if possibly well based has little pertinence to the issue. Had this debate not settled the question for the legislators, it would surely have been raised again in the final two years of strenuous debate on other portions of the legislation before the statute was enacted. Thus the very weakness of the answers suggested tends to prove the point as to the colloquy itself.

Hence it is difficult to perceive the reasons why our brothers have chosen the view they now adopt and press. It has been said that there is a continuing debate between Congress and the courts over immigration and nationality legislation, with the latter pressing the humanitarian approach as against the sterner legislative view. 71 Yale L.J. 760 (1962). Be that as it may, it is hard to see how humanitarian reasons can be resorted to here to limit the meaning of the statutory enactments. In view of the unusually distinguished support, cited above, which the legislation brought out, we surely must hesitate to be certain that it is actually inimical to the interests of aliens. And we cannot shut our eyes to the vigorous, even bitter, debate, within and without the halls of Congress in 1961 as to whether the review provisions of the act created undue hardship for the alien.[8] After such a thorough consideration by the legislators charged with the major responsibility in the premises, it is a question how far the courts may assume the role of knight-errant to correct assumed unfairnesses.

The question becomes the more pressing when we see the increased confusion and labor for the courts and litigants now impending and appreciate that the one clear result of the statutory reform under court amputation is now only to add extensive delay—of surely a year or more—to an already delaying procedure. Is it a boon to an alien, doomed eventually to be deported, to gain some more time while the doom continues to hang over him? And yet we perceive no other practical reason for the narrowing construction of a remedial statute here advanced. Hence we think the statutory purpose should be carried out. We believe we have jurisdiction to adjudicate Foti's petition on the merits and should proceed to do so.

8. This is recounted with full citations in 71 Yale L.J. 760 n. 3, 762 nn. 2–4 (1962). Included are references to a debate in the weekly New Republic involving Representative Walter, Assistant Attorney General Katzenbach, and the editors, coming finally to the question, "Did the New Republic Misrepresent Francis Walter's Bill?" Objection centered chiefly on the increased cost and inconvenience of applying to a court of appeals for review, and on the short statute of limitations, with the contention that the act will affect chiefly aliens with limited resources. It is said that many of those opposed were induced finally to vote for the Conference Report because of their desire to achieve passage of the alien orphan program and other humanitarian provisions which had been added to the original bill. Ibid. Of course the additional possibilities for delay afforded under the present decision will give increased opportunities for litigation to aliens of means.