**Athanasios PATSIS, a/k/a Thomas Nickas, Petitioner,**

v.

**IMMIGRATION & NATURALIZATION SERVICE, Respondent.**

**No. 17316.**

United States Court of Appeals
Eighth Circuit.

Oct. 29, 1964.

Albert J. Yonke, Kansas City, Mo., made argument for petitioner and filed brief.

Don Bennett, Atty., Immigration & Naturalization Dept., Washington, D. C., made argument for respondent and filed brief with Kenneth C. Shelver, Atty., Dept. of Justice, Washington, D. C. and Richard D. FitzGibbon, U. S. Atty., and Grove G. Sweet, Asst. U. S. Atty., St. Louis, Mo.

Before VOGEL, MATTHES and BLACKMUN, Circuit Judges.

BLACKMUN, Circuit Judge.

Athanasios Patsis petitions for review of a final order of the Board of Immigration Appeals dismissing his appeal from an order of the Special Inquiry Officer. The exclusive jurisdiction of a court of appeals to review this administrative determination is now established by Foti v. Immigration & Naturalization Service, 375 U.S. 217, 229–232, 84 S.Ct. 306, 11 L.Ed.2d 281 (1963), and by § 106(a) of the Immigration & Nationality Act,[1] 8 U.S.C. § 1105a, as added September 26, 1961, effective October 26, 1961, Pub.L. 87–301, § 5(a), 75 Stat. 651. Inasmuch as the proceedings before the Special Inquiry Officer were conducted in Kansas City, Missouri, and Patsis' present residence is in that city, venue is in this court. Section 106(a) (2).

Patsis, a paint shop employee, was born in February 1904. He is a native and citizen of Greece. He has had a wife in that country since 1926 and has two children there. The children are now adults. The chronology is not in dispute:

1. Patsis first arrived in the United States on January 24, 1936, as a member of the crew of the steamship "Mount Para" inbound from Buenos Aires. He was temporarily admitted as a crewman pursuant to § 3(5) of the Immigration Act of 1924, 43 Stat. 154.

2. He promptly deserted his ship and remained in this country. He assumed the name of Thomas Nickas. He was taken into custody on a deportation warrant in January 1943. After a hearing he was ordered deported and, in fact, was deported from San Francisco aboard the steamship "Hellenic Beach" on April 6, 1947.

3. He returned to the United States as a member of the crew of the same ship on October 21, 1948, and was again admitted temporarily under the 1924 Act as a seaman. He deserted his ship once more and remained here. He possessed no immigration visa or other document authorizing his admission for permanent residence.

4. In April 1962 he was served with an order to show cause why he should not be deported, pursuant to § 241(a) (1) of the Immigration & Nationality Act, 8 U.S.C. § 1251(a) (1), in that "at the time of entry", October 21, 1948, he "was within one or more of the classes of aliens excludable by the law existing at the time of such entry", that is, he was excludable at the time of that entry under § 1(a) of the Act of March 4, 1929, as amended, 45 Stat. 1551 and 47 Stat. 166. This latter Act provided that "if any alien has been arrested and deported in pursuance of law, he shall be excluded from admission to the United States" unless "prior to his reembarkation at a place outside the United States * * * the [Attorney General], in his discretion, shall have granted such alien permission to reapply for admission".

His deportation hearing was held in March and April 1962. It was there conceded that Patsis had not, before the 1948 reentry, received permission to apply or reapply for subsequent admission to the United States. Counsel, however, would not admit that Patsis was subject to deportation because "this admission would be a conclusion of law".

1. Because of the many statutes which are pertinent to this case, we do not encumber this already too lengthy opinion by setting them forth even by footnote. Anyone interested is assumed necessarily to have access to the complete texts.

At the hearing Patsis applied (a) for suspension of deportation, under § 244(a) of the Act in its 1952 form, 8 U.S.C. § 1254(a), that is, as the statute read prior to the amendment effected October 24, 1962, by Pub.L. 87–885, § 4, 76 Stat. 1247; (b) for a waiver, under § 211(b), 8 U.S.C. § 1181(b), of documents otherwise required, on the ground that "I did not intend to remain in U.S. when I entered"; (c) for permission, under § 212 (a) (17), 8 U.S.C. § 1182(a) (17), to reapply for admission, nunc pro tunc as of the date of his last entry, on the ground that "It would be an extreme hardship to have to return to Greece. I have lived and worked in U.S. for 25 yrs. and own property here. I could not live nor find work in Greece"; and (d), in the alternative, for voluntary departure at his own expense in lieu of deportation, under § 244(e), 8 U.S.C. § 1254(e).

The Special Inquiry Officer, by his decision dated November 30, 1962, found Patsis was deportable, granted his request for voluntary departure in lieu of deportation, ordered deportation in the event he failed to depart voluntarily, and denied all other requested relief. In so doing the Officer concluded that:

1. Patsis was deportable because, under the 1929 Act, as amended, he had been deported before and had reentered without permission to reapply for admission.

2. Patsis' application for waiver of entry documents under § 211(b) could not be granted because: his only entries into this country were as a crewman; he had never acquired the status of a lawful permanent resident of the United States; the provisions of § 211(b) are discretionary and have application only to "otherwise admissible aliens lawfully admitted for permanent residence who depart from the United States temporarily" and were therefore not available to him; there is no other statutory authority for the admission of an alien for permanent residence unless he has an immigration visa; and the discretionary adjustment of status provisions of § 245(a), 8 U.S.C. § 1255(a), by their very terms, have

not been applicable to "an alien crewman" since the section's amendment in 1960 by Pub.L. 86–648, 74 Stat. 505.

3. Patsis' application for nunc pro tunc permission to reapply under § 212 (a) (17) could not be granted because the only basis for such permission "is to remove a ground of inadmissibility except for which an alien would not be deportable", and such was not the situation here.

4. Patsis' application for suspension of deportation under § 244 could not be granted inasmuch as:

a. This statute, by its paragraph (f), added in October 1962, flatly provides "No provision of this section shall be applicable to an alien who (1) entered the United States as a crewman; * * * *".

b. The fact Patsis' application for suspension was filed on April 25, 1962, before the October enactment of § 244 (f), and at a time when the statute did not specifically exclude a crewman from its discretionary suspension benefits is of no significance where the Officer's decision is made subsequent to the adoption of the statute.

c. Anyway, Patsis did not qualify for suspension under § 244 as it read prior to the 1962 amendment and the addition of paragraph (f). This is so because (i) his application was not filed within five years after the effective date of the Act (December 23, 1952) as required by § 244(a) (1); (ii) inasmuch as he last entered the United States in 1948, he is not within the period ("Within two years prior to, or at any time after the date of the enactment of this Act" [June 27, 1952]), required for relief under § 244(a) (2), (3), (4), and the second alternative of (5); and (iii) the claim that Patsis was deportable under one of the specified paragraphs, namely, § 241(a) (5), with its reference to § 265, 8 U.S.C. § 1305 (willful failure to file an address report card), is not helpful to him under the first alternative of § 244(a) (5) because it was not the charge lodged

against him and because, in any event, never having filed an address report card at all, he has not fulfilled the 10-year requirement of § 244(a) (5).

In granting voluntary departure the Officer concluded that, although Patsis admitted a common law relationship with a woman in the United States until about 1951 and her attainment of an Iowa divorce from him in 1950 with a property settlement, while at the same time he had a wife and children in Greece, he had established "good moral character for at least five years immediately preceding his application", as § 244(e) prescribes, and the possession of means with which to depart promptly.

We thus have a situation where Patsis has been frustrated in all his attempts to legalize his entry and status in the United States. The facts remain that he did effect an illegal entry, not once but twice; that he jumped ship; that when he stayed, he knew the illegality of the entries thus effected; and that the second entry was made after he had already been deported formally once.

We have described the Special Inquiry Officer's disposition of the case in detail in order to show the several points which were raised before him, his analysis of the complicated statutes, and his resolution of some factors in Patsis' favor so that every provision of the Act which has any conceivable application could be considered. As stated at the beginning of this opinion, the Board of Immigration Appeals sustained the Officer's decision. In so doing it concluded, "We know of no administrative relief for which respondent is eligible other than voluntary departure".

Patsis' case as presented to us centers on the issue of the availability to him of the several discretionary suspension of deportation provisions of § 244; if any of these is available, the Officer and the Board erred in denying consideration of his case by the Attorney General. The following questions arise:

May the exclusion-of-a-crewman provision of § 244(f), which came into the statute only in October 1962 after Patsis had filed his application for suspension, be validly applied to him?

If not, then, it being readily apparent, for the reasons stated by the Officer, that paragraphs (1), (2), (3), (4), and the second alternative of (5) of § 244(a) have no possible application to Patsis, is he deportable under the first alternative of paragraph (5)?

We discuss these and their several aspects in turn:

1. *Section 244(f) (1), 8 U.S.C. § 1254(f) (1).* Although urging that § 244 (f) (1) "should not apply to his case, Patsis, in effect, concedes that it is not an ex post facto law, within the proscription of art. I, § 9, clause 3, of the federal Constitution, for in his brief he states, "Actually, this may not be a true *ex post facto* case even though the amendment did disqualify petitioner". In any event, it seems to be settled, despite continuing dissents, that the clause does not apply to statutorily specified grounds for deportation and that retroactive application of new grounds is not unconstitutional. Marcello v. Bonds, 349 U.S. 302, 314, 75 S.Ct. 757, 99 L.Ed. 1107 (1955); Galvan v. Press, 347 U.S. 522, 531, 74 S. Ct. 737, 98 L.Ed. 911 (1954); Harisiades v. Shaughnessy, 342 U.S. 580, 594–595, 72 S.Ct. 512, 96 L.Ed. 586 (1952). See Lehmann v. United States ex rel. Carson, 353 U.S. 685, 690, 77 S.Ct. 1022, 1 L.Ed. 2d 1122 (1957) and Mulcahey v. Catalanotte, 353 U.S. 692, 694, 77 S.Ct. 1025, 1 L.Ed.2d 1127 (1957).

■■ Furthermore, we are concerned here with administrative power. If a statutory provision as to administrative discretion is changed between the hearing and the decision the agency must apply the new law. Ziffrin, Inc. v. United States, 318 U.S. 73, 78, 63 S.Ct. 465, 87 L.Ed. 621 (1943). Specifically, if the Attorney General's discretionary power to adjust the status of an alien crewman (assuming that the power exists in the first place) is taken away after the application has been filed but before final administrative decision, the application

must be denied. It has been so held with respect to a crewman's application for adjustment of status under § 245(a), 8 U.S.C. § 1255(a), and the 1960 amendment thereto. Fassilis v. Esperdy, 301 F.2d 429, 432, 434 (2 Cir. 1962), where the court said " * * * the Commissioner was required by the new amendment to deny the applications". And it has now been held that the same result ensues with respect to § 244(f) (1) itself when that statute's amendment took place after the crewman's application for discretionary relief and even after its eventual review by a court of appeals, Foti v. Immigration & Naturalization Service, 308 F.2d 779 (2 Cir. 1962), but before its reconsideration by the appellate court after reversal by the Supreme Court at 375 U.S. 217, 84 S.Ct. 306. Foti v. Immigration & Naturalization Service, 332 F.2d 424 (2 Cir. 1964).[2]

▇▇▇ Patsis would avoid this result by two arguments:

a. He suggests that the Special Inquiry Officer "conveniently" delayed his decision from April 25, 1962, when the hearing ended, to November 30, when his decision was entered, in order to take advantage of the October 1962 amendment which then was pending in Congress. On this record, however, we cannot draw any such conclusion. The record contains nothing whatsoever indicative of purposefully prejudicial delay. Further, Patsis made no claim along this line before the Board to which he thereafter appealed. Any claim of improper conduct or non-feasance by the Officer should first be presented to the agency if it is to be considered on appellate court review.

Unemployment Compensation Comm'n. v. Aragon, 329 U.S. 143, 155, 67 S.Ct. 245, 91 L.Ed. 136 (1946); United States v. L. A. Tucker Truck Lines, Inc., 344 U.S. 33, 73 S.Ct. 67, 97 L.Ed. 54 (1952); Hart v. ICC, 226 F.Supp. 635, 643 (D. Minn.1964).[3] Patsis, not having raised the issue before the Board of Immigration Appeals, and apparently possessing, as to it, nothing of greater dignity than mere suspicion, is not entitled to raise it here.

▪▇▇ b. Apart from any question of motive in the alleged delay in the Officer's decision, Patsis suggests that he should not be made to suffer by the lapse of intervening time.[4] He relies on the income tax interest case of United States v. Magnolia Petroleum Co., 276 U.S. 160, 162–163, 48 S.Ct. 236, 237, 72 L.Ed. 509 (1928) ("Statutes are not to be given retroactive effect or construed to change the status of claims fixed in accordance with earlier provisions unless the legislative purpose so to do plainly appears"); the death-of-a-party case of Mitchell v. Overman, 103 U.S. 62, 64–65, 26 L.Ed. 369 (1881); and Judge Bryan's opinions in the naturalization cases of Application of Martini, 184 F.Supp. 395, 400–402 (S.D. N.Y.1960), and Matter of Vacontios, 155 F.Supp. 427 (S.D.N.Y.1957). We doubt whether the facts of these four cases provide a valid precedent for the application of their principle to the facts of this case. See the decision of the Second Circuit in Fassilis, supra, p. 434 of 301 F.2d, where, however, the time lapse in each of the cases consolidated for that appeal was less than that present here. In any event,

2. The Supreme Court, in its fourth footnote in Foti, supra, p. 220 of 375 U.S., 84 S.Ct. 306, noted the enactment of the 1962 amendment, felt that its applicability to that alien was arguable, and concluded that it did not necessarily render moot the jurisdictional issue then under consideration by the Court.

3. The Special Inquiry Officer's affidavit, submitted on this appeal, to the effect that the delay was occasioned by central office instructions to await the possible enactment of other then pending legisla-

tion which would have been favorable to Patsis, is perhaps revealing, but should be passed on in the first instance at the administrative level. SEC v. R. A. Holman & Co., 116 U.S.App.D.C. 279, 323 F.2d 284, 287 (1963) cert. denied 375 U.S. 943, 84 S.Ct. 350, 11 L.Ed.2d 274.

4. This, of course, assumes that the Officer's decision necessarily would have been in Patsis' favor had it been issued prior to the enactment of § 244(f) on October 24. The Officer by his decision held otherwise. .

we agree with Judge Waterman when he there said, pp. 432–433 of 301 F.2d:

"* * * the appellants had no established right to the future status that they were seeking to obtain by their applications. * * * [T]he status each of them sought the agency to award them was not acquirable until final administrative action upon their applications."

2. *Section 405(a) of the 1952 Act.* This Act, in its § 405(a), contains a savings clause which provides generally that nothing in the Act "shall be construed to affect the validity" of any proceeding "which shall be valid at the time this Act shall take effect". See 8 U.S. C.A. § 1101, historical note. Patsis argues that the policy which obviously occasioned this savings clause should have equal application to the amendment effected in 1962 by the addition of § 244 (f). We do not agree because, first, § 405(a), although broad, speaks narrowly in terms of "this Act" and "the time this Act shall take effect" and thus implies its non-application to amendments in the future; second, the 1962 Act itself contains no comparable savings clause; and, third, the reasoning in Fassilis and the second Foti persuades us otherwise.

Therefore, absent other considerations, we would agree with the conclusions reached by the Second Circuit in Fassilis and in the second Foti, and would hold that we have no alternative than to conclude that Congress' flat prohibition of the application of § 244(f) "to an alien who * * * entered the United States as a crewman" bars discretionary suspension of deportation for Patsis. This would end his case.

But because deportation is so drastic a penalty and can be the equivalent of banishment or exile, Delgadillo v. Carmichael, 332 U.S. 388, 391, 68 S.Ct. 10, 92 L.Ed. 17 (1947); Fong Haw Tan v. Phelan, 333 U.S. 6, 10, 68 S.Ct. 374, 92 L.Ed. 433 (1948), and because we do not wish to give less than the utmost consideration to this alien, we assume, for purposes of this case only, that § 244

(f) (1) is not to be applied to Patsis, and we pass on to the other points he raises.

3. *Section 244(a) (5) and the cross-references to §§ 241(a) (5) and 265, 8 U.S.C. §§ 1254(a) (5), 1251(a) (5), and 1305.* Section 265 provides that an alien who is in the country on January 1 of any calendar year and who was required to be registered, shall notify the Attorney General in writing of his current address within 30 days. Section 241(a) (5) makes noncompliance with § 265 a deportable offense unless reasonably excusable or not willful. And § 244(a) (5) makes deportation under § 241(a) (5) subject to discretionary suspension.

Patsis concedes his failure both to register and to file an address card annually at any time since his entry in 1948. He then argues that he willfully violated § 265, that this is a deportable offense, and that he is subject to discretionary suspension.

But § 244(a) (5) imposes conditions for the availability of its discretionary relief. Among these is the requirement that the alien be "physically present in the United States for a continuous period of not less than ten years immediately following the commission of an act, or the assumption of a status, constituting a ground for deportation, and proves that during all of such period he has been and is a person of good moral character". We defer for the moment the requirement of good moral character. The question, then, is whether Patsis had satisfied the 10-year condition. Obviously, at the time of his application, he had been in the United States continuously for more than 10 years since his last entry. He had been here continuously for more than 10 years since he committed the offense of illegal entry for which he would be deportable under § 241(a) (1). He had been here continuously for more than 10 years since he first failed to register under the 1940 Act. And he had been here continuously for more than 10 years since he first failed to file the annual address card required, for the first time, by § 24 of the Subversive Activities Control Act

of 1950. But he had *not* been here continuously for more than 10 years since he failed to file any annual address card required under the 1952 Act.

The statement of these facts at once raises several subsidiary questions: (a) Is the 10-year period confined to those deportable offenses to which § 244(a) (5) itself makes reference? If so, Patsis' 1948 entry, illegal under § 241(a) (1), and as to which he is charged, is not helpful for this is not one of the paragraphs referred to in § 244(a) (5). (b) Is failure to file the annual address card confined to such failure under the 1952 Act and inapplicable to failure under the 1950 Act? If so, inasmuch as the 1952 Act was effective only on December 23, 1952, and the first address card was required under it only in January 1953, Patsis clearly had not fulfilled the 10-year requirement when he applied for discretionary suspension in April 1962 or even by the time the Special Inquiry Officer rendered his decision in November 1962. (c) Is the 10-year requirement satisfied when a decade elapses from the first commission of a deportable act or does the later commission of another such act within 10 years of the application mean that the 10-year requirement is not satisfied or, to put it another way, may the lapse of 10 years from the first deportable offense enable the alien to commit subsequent deportable offenses with impunity so far as his discretionary status is concerned?

The first of these three questions we need not face. It certainly is an arguable one. But the Ninth Circuit, in Fong v. Immigration & Naturalization Service, 308 F.2d 191, 194–196 (1962), appears to have held that a decade of deportable status under a section not referred to by § 244(a) (5) satisfies the latter's 10-year requirement. For the purpose of the present case we accept that result without expressing either agreement or disagreement with it.

■ The second of the three questions, it seems to us, is clearly to be answered in the affirmative. The annual filing of an address card was required for the first time under the 1950 Act. But failure to file a card was not made a deportable offense until the 1952 Act became effective. Matter of V—R—, 9 I & N Decisions 340, 347 (1961). See Fong, supra, where the court said, p. 194 of 308 F.2d, with respect to an alien who had been in the country since 1943 and was in deportable status on another ground since 1944, "His first violation under this provision [failure to report annually] occurred about February 1, 1953". Thus, Patsis' first failure to file an address report which qualified as a deportable offense was in January 1953, and 10 years had not elapsed at the time he filed his application.

■ This takes us to the third question and the application of the 10-year requirement of § 244(a) (5) to successive offenses. Our initial reaction was that the 10-year requirement is, so to speak, the imposition of a testing period; that each failure to file as required by § 265 is a separate and distinct offense; that each such failure is, indeed, one made criminal by § 266(b), 8 U.S.C. § 1306(b), and there, also, (in addition to the interplay of §§ 241(a) (5) and 265) subjects the offender to deportation; and that the purpose of the 10-year requirement is to provide relief, by way of possible suspension of deportation, for an alien whose behavior during the decade immediately preceding his application has been acceptable under the statutory standard. We would have regarded it as a matter of common sense interpretation not to wring good fortune for an alien out of the statute because of a deportable offense committed more than 10 years previously when he continues to commit other deportable offenses in the interim. The 10-year span surely must have been a qualifying period which the Congress felt to be of sufficient length to provide enough assurance that the alien would be an acceptable addition to society despite any misstep of a decade or more ago. To hold otherwise would penalize an alien who commits only one deportable offense (such as a willful failure to file an address card in only one year) and commits

it within the 10-year period, as contrasted with an alien whose record of deportable misdeeds not only takes in the immediate past decade but stretches back before it. This could not have been the sense of Congress in enacting § 244(a) (5).

Patsis argues that this interpretation "would completely eliminate" failure to report "as one basis for granting suspension of deportation", and that this is so because registration reveals the alien's presence in the country, alerts the authorities, and reduces his chances of remaining. This, however, is not a game which the Nation plays with aliens. We are not persuaded by this approach and, apparently, neither is the Service. In Matter of V— R—, supra, the Board of Immigration Appeals computed the determinative 10-year period from the date of the last, not the first, failure to register. It recognized that there may be some inconsistency in the statute but it said, p. 344 of 9 I & N Decisions,

> "Moreover, it seems quite unlikely to us that Congress could have intended that the alien whose wrongdoing continued to the moment of his apprehension should have the same favorable opportunities as the alien whose wrongdoing ceased ten years prior to his apprehension."

We were disturbed, therefore, when the Service, not Patsis, called our attention to Fong on this point, for in that case the Ninth Circuit held otherwise and ruled that a deportable status acquired more than 10 years earlier satisfied the 10-year condition, despite a violation of the address filing requirement within the decade. This conclusion appears to have been reached on the grounds that (a) the statute does not state that the 10-year period is to run after the alien last became deportable; (b) the statute is thus open to two possible constructions; (c) Fong's misadventure was "innocuous and minor" as compared with the type of conduct condemned under the other paragraphs to which § 244(a) (5) refers; and (d) deportation is a drastic measure. Pp. 194–95 of 308 F.2d. Certiorari was not applied for in Fong.

The facts of Fong were appealing. That alien was a Chinese native who worked as a seaman on a British tanker in the last war. He was rescued when his ship was sunk. His admission to the United States in 1943 "was to allow him to ship out as a seaman or otherwise give service in the war effort". He registered for military service. He had no criminal record. Hardship was present. There was no evidence that he had any connection with subversive groups. Patsis' facts are somewhat less appealing, for he twice has made illegal entry and has experienced deportation. Still, he, as Fong, has not been convicted of subversion, violence, or crime.

We deal, however, with a statute as it has been enacted by Congress and we feel that it is not for the courts to measure whether failure to file address cards does or does not equate with subversion and immorality. Congress has said in so many words, and clearly, that it does.

The legislative history provides atmosphere and lends additional support to our conclusion. See Eichenlaub v. Shaughnessy, 338 U.S. 521, 532, 70 S.Ct. 329, 94 L.Ed. 307 (1950), and Costello v. Immigration & Naturalization Service, 376 U.S. 120, 124, 84 S.Ct. 580, 11 L.Ed.2d 559 (1964). The device of suspension of deportation for aliens who, despite deportability, have proved themselves to be acceptable residents, first appeared in the Alien Registration Act of 1940, § 20, 54 Stat. 671. The list of aliens eligible for suspension was broadened by the Act of July 1, 1948, 62 Stat. 1206. The 1948 Act, however, did not change the 1940 Act's prohibition of the granting of suspension to aliens of the subversive and immoral classes. The Subversive Activities Control Act of 1950 rested on detailed legislative findings as to the Communist movement. See Carlson v. Landon, 342 U.S. 524, 534–537, 72 S.Ct. 525, 96 L.Ed. 547 (1952). It required for the first time the annual address report and made noncompliance a crime. The current 1952 Act was adopted in the midst of the Korean War. It continued, in its § 265, the requirement of an annual ad-

dress report and, in its § 266(b), the criminal provision, but for the first time it also provided, by § 241(a) (5), for deportability for violation of the reporting requirement unless reasonable excuse or absence of willfulness was established. This was classified, through § 244(a) (4) and (5), with the subversive and the immoral. This must have been done with the thought that annual filing was an effective way to combat Communism and to keep track of those aliens engaged in subversion. For these aliens, the longest residence requirement, that of 10 years, was established. Paragraphs (1), (2), and (3) of § 244(a) have residence requirements of only seven or five years. Furthermore, as to an alien covered by § 244(a) (1), (2), or (3), a grant of suspension is *absolute* unless a resolution of disfavor is timely adopted by either the Senate or the House. § 244(b). On the other hand, as to an alien covered by § 244(a) (4) or (5), a grant of suspension is *ineffective* unless the Congress favors the suspension by concurrent resolution. § 244(c). Thus, the one becomes effective in the event of inaction by both Houses of Congress. The other becomes effective only in the event of positive action by both Houses.

All this demonstrates a purposeful classification by Congress, for reasons which it deemed sufficient, of the nonfiler together with the subversive and the immoral. Accordingly, despite the customary strict approach to these immigration statutes, Costello v. Immigration & Naturalization Service, supra, p. 128 of 376 U.S., 84 S.Ct. 580, we must disagree with this particular result reached by the Ninth Circuit in Fong and with its characterization, p. 195 of 308 F.2d, of the filing requirement as "only a minor infraction of law". Congress has classified it otherwise.

Accepting this joint classification, as we do, it follows that the 10-year period must be one of acceptable behavior for all in the classification, including the nonfiler. It would be unthinkable that the further commission of a suversive or immoral act of the kind contemplated by § 244(a) (4) would lose significance because of the presence of a similar kind of act more than 10 years earlier. Impunity, whether it be for the socially undesirable or for the one who fails to file, is not so easily to be gained.

■■■ 4. *Section 244(a) (5) and immorality.* Patsis asserts that it is uncontradicted in the record that he was "guilty of the crimes of bigamy and adultery under the laws of the State of Iowa"; that because of this he was deportable under § 244(a) (5); and that these criminal acts terminated more than 10 years prior to the filing of his application. There is no merit in this suggestion. Deportability under § 244(a) (5), with respect to a post-entry crime of moral turpitude, relates only to § 241(a) (4), and this statute in turn requires conviction for the crime. Patsis has not been convicted of either bigamy or adultery. His admissions, consequently, have no materiality here.

Of course, there are elements of hardship in Patsis' case. We are not unaware of these. But, in a very real sense, they are of Patsis' own making. They exist because of his illegal entries and because of his attainment of a measure of success in this country. Nearly every contested deportation case has its hardship aspect. We think that the solution to his problem is not judicial action but is congressional action, similar, perhaps, to that proposed by § 4 of House Bill No. 11911, 87th Cong., introduced in 1962 but not enacted. Thus far, the acts of Congress, as we see them, do not provide him an avenue of relief. Compare Mrvica v. Esperdy, 376 U.S. 560, 84 S.Ct. 833, 11 L.Ed.2d 911 (1964).

With some reluctance on our part, the relief requested by the petition for review is denied.