## MATTER OF FEDORENKO

## In Deportation Proceedings

## A-7333468

### Decided by Board April 17, 1984

(1) Under the judicially-developed doctrine of collateral estoppel, a prior denaturalization judgment conclusively establishes the "ultimate facts" of a subsequent deportation proceeding, i.e., those facts upon which an alien's deportability and eligibility for relief from deportation are to be determined, and precludes reconsideration of issues of law resolved by the prior judgment, so long as the issues in the prior suit and the deportation proceeding arise from virtually identical facts and there has been no change in the controlling law.

(2) The doctrine of collateral estoppel applies in deportation proceedings when there has been a prior judgment between the parties that is sufficiently firm to be accorded conclusive effect, the parties had a full and fair opportunity to litigate the issues resolved by and necessary to the outcome of the prior judgment, and the use of collateral estoppel is not unfair. *Title* v. *INS*, 322 F.2d 21 (9th Cir. 1963), distinguished.

(3) The language in section 242(b) of the Immigration and Nationality Act, 8 U.S.C. § 1252(b) (1982), which provides that a deportation proceeding shall be "the sole and exclusive procedure for determining the deportability of an alien," does not preclude the use of collateral estoppel in a deportation proceeding; rather this language was intended to exempt deportation proceedings from the provisions of any other law, most particularly the Administrative Procedure Act of June 11, 1946, 60 Stat. 237, *repealed by* Pub. L. No. 89-554, 80 Stat. 378 (1966).

(4) A former prisoner of war of the Nazis who was forced to serve, upon penalty of death, as a concentration camp guard is deportable pursuant to section 241(a)(19) of the Act, 8 U.S.C. § 1251(a)(19) (1982), for assisting the Nazis in persecuting others, even if his actions were involuntary and he personally harbored no racial or religious prejudice against Jews; the objective effect of an alien's actions, not his motivation and intent, controls in determining whether he "assisted" in persecution within the meaning of section 241(a)(19).

(5) The 1981 amendment to section 244(a) of the Act, 8 U.S.C. § 1254(a) (1982), which withdrew suspension of deportation as an available form of relief in the case of aliens found deportable pursuant to section 241(a)(19) for assisting the Nazis in persecution, is properly applicable to an application for suspension of deportation filed prior to the 1981 amendment.

CHARGE:
Order: Act of 1952—Sec. 241(a)(1) [8 U.S.C. § 1251(a)(1)]—Excludable at entry under sections 2 and 10 of the Displaced Persons Act of 1948

Sec. 241(a)(2) [8 U.S.C. § 1251(a)(2)]—Entered in violation of sections 2 and 10 of the Displaced Persons Act of 1948

Sec. 241(a)(19) [8 U.S.C. § 1251(a)(19)]—Participation in Nazi persecution

ON BEHALF OF RESPONDENT:
Brian M. Gildea, Esquire
The Hotchkiss House
512 Blake Street
New Haven, Connecticut 06515

ON BEHALF OF SERVICE:
Joseph P. Lynch
Trial Attorney
Office of Special
   Investigations,
   Criminal Division
Department of Justice

BY: Milhollan, Chairman; Maniatis, Dunne, and Vacca, Board Members. Board Member James P. Morris has abstained from consideration of this case.

In this appeal the respondent challenges the immigration judge's February 23, 1983, decision finding the respondent deportable as charged and denying him suspension of deportation pursuant to section 244(a)(1) of the Immigration and Nationality Act, 8 U.S.C. § 1254(a)(1) (1982). We affirm the immigration judge's decision in substantial part and dismiss this appeal.

The respondent is a 76-year-old male native and citizen of the Ukraine in the U.S.S.R. He entered the United States in 1949 as an immigrant, pursuant to the Displaced Persons Act of 1948, 62 Stat. 1009 ("DPA"), which was enacted by Congress to enable European refugees driven from their homelands by World War II to immigrate to the United States. In 1970 the respondent became a naturalized citizen of the United States.

In 1977 the Government brought a denaturalization action against the respondent in the United States District Court for the Southern District of Florida, alleging that he illegally procured his citizenship by failing to disclose that he had been a guard at the Nazi death camp, Treblinka, during World War II. *United States* v. *Fedorenko,* 455 F. Supp. 893 (S.D. Fla. 1978). The district court entered a judgment for the respondent, *id.,* but the United States Court of Appeals for the Fifth Circuit reversed and ordered entry of a judgment of denaturalization. *United States* v. *Fedorenko,* 597 F.2d 946 (5th Cir. 1979). The Supreme Court affirmed the judgment of the court of appeals. *Fedorenko* v. *United States,* 449 U.S. 490 (1981). Accordingly, on March 11, 1981, the district court revoked

58

the respondent's citizenship and cancelled his certificate of naturalization.

On or about March 17, 1981, the Immigration and Naturalization Service commenced deportation proceedings against the respondent, alleging, inter alia, that he had served as an armed guard at Treblinka during World War II, had lied in his visa application about his wartime activities, and consequently had been ineligible for a visa and inadmissible under the DPA. On the basis of these allegations the Service charged the respondent with being deportable: (1) pursuant to section 241(a)(2) of the Act, 8 U.S.C. § 1251(a)(2) (1982), as an alien who entered the United States in violation of section 10 of the DPA by willfully misrepresenting material facts for the purpose of gaining entry to the United States; (2) pursuant to section 241(a)(2) of the Act, as an alien who entered the United States in violation of section 2 of the DPA because he assisted the enemy regime of Nazi Germany in persecuting civilian populations; (3) pursuant to section 241(a)(1) of the Act, as an alien who was within a class of aliens excludable under the law existing at the time of entry because he was an immigrant not entitled to enter the United States under sections 2 and 10 of the DPA; and (4) pursuant to section 241(a)(19) of the Act, as an alien who assisted the Nazi government of Germany in the persecution of persons because of their race or religion during the period beginning on March 23, 1933, and ending on May 8, 1945.

At the deportation hearing, the respondent denied each of the charges of deportability. He argued that he should not be deported for falsifying information in his visa application because he did so merely to avoid repatriation to the Soviet Union. He also argued that he should not be deported for having assisted the Nazis in persecution because he involuntarily served at Treblinka as a prisoner of war, under constant fear of death. The Service took the position that the denaturalization judgment resolved the significant issues in the case and established the respondent's deportability on all of the charges.

The respondent applied at the deportation hearing for suspension of deportation, a discretionary form of relief which is available to an alien who can show that he has been continuously physically present in the United States for the 7 years immediately preceding his application for suspension, that he has been a person of good moral character during that time, and that his deportation would cause "extreme hardship" to him or to a spouse, parent, or child who is a United States citizen or a permanent resident alien. Section 244(a)(1) of the Act. Suspension of deportation is not available to an alien found to be deportable under section 241(a)(19) of the

Act for assisting the Nazis in persecution. *Id.* In support of his suspension application, the respondent testified that he would suffer "extreme hardship" upon deportation because he is old, he suffers from a number of diseases of varying severity, and he would be deprived of the social security and pension payments which are his sole source of support.

On February 23, 1983, the immigration judge issued his written decision in the case. He found the respondent deportable pursuant to sections 241(a) (1) and (2) of the Act on the basis of the Supreme Court's decision in the denaturalization case and the principles of res judicata. He dismissed as a contrivance the respondent's claimed fear of death at the hands of the Nazis and found the respondent's service at Treblinka to have been voluntary. Holding that voluntary service as a concentration camp guard constituted "assistance" in "persecution" within the meaning of the Act, he found the respondent deportable pursuant to section 241(a)(19).

The immigration judge also found the respondent ineligible for suspension of deportation. He concluded that the respondent was precluded as a matter of law from obtaining suspension of deportation because of his deportability under section 241(a)(19). He found that the respondent had failed to satisfy the "continuous physical presence" and "extreme hardship" prerequisites for suspension of deportation. *See* section 244(a)(1) of the Act. He also indicated that even if the respondent had been eligible for suspension of deportation, the relief would not be warranted as a matter of discretion. The immigration judge ordered the respondent to be deported to the U.S.S.R.

On appeal, the respondent concedes deportability pursuant to section 241(a)(2) of the Act but contests deportability pursuant to sections 241(a) (1) and (19).[1] He also challenges the denial of his application for suspension of deportation.

The Service has moved for summary dismissal, arguing that the respondent's appeal is frivolous. We consider this appeal to present important issues of law which may have severe consequences for the respondent. Therefore, the appeal deserves our full consideration and is not suitable for summary dismissal.

---

[1] The respondent's initial brief on appeal states that the finding of deportability pursuant to section 241(a)(1) is at issue but does not discuss at any greater length the respondent's reasons for challenging this finding.

## THE LEGAL EFFECT OF THE JUDGMENT IN THE
## DENATURALIZATION PROCEEDING

The judicially-developed doctrine of collateral estoppel, which is related to the doctrine of res judicata, precludes parties to a judgment on the merits in a prior suit from relitigating in a subsequent action issues that were actually litigated and necessary to the outcome of the prior suit. *Parklane Hosiery Co., Inc.* v. *Shore,* 439 U.S. 322, 326 n.5 (1979); 1B J. Moore, *Federal Practice and Procedure* ¶0.441[2], at 723-25 (2d ed. 1981). The doctrine of collateral estoppel generally applies to the Government as well as to private litigants. *See United States* v. *Mendoza,* 464 U.S. 154 (1984). Thus, the judgment in the respondent's denaturalization case raises the question whether collateral estoppel may be applied to preclude the Service and the respondent from litigating certain issues presented in this proceeding.

In order for collateral estoppel to be invoked in a given case, there must have been a prior judgment between the parties that is sufficiently firm to be accorded conclusive effect [2] and the parties must have had a full and fair opportunity to litigate the issues in the prior suit. 1B J. Moore, *supra,* ¶0.441[2], at 725. *See generally Matter of McMullen,* 17 I&N Dec. 542, 548 (BIA 1980), *rev'd on other grounds,* 658 F.2d 1312 (9th Cir. 1981). In addition, the use of collateral estoppel must not be unfair to the parties. 1B J. Moore, *supra,* ¶0.441[2], at 725.

We find these general prerequisites for collateral estoppel to be satisfied in the respondent's case. The Supreme Court's judgment in the denaturalization proceeding is a final judgment. Thus, it is fair to accord the judgment conclusive effect. The respondent and the United States, who were the parties in the denaturalization proceeding, are also the parties in this deportation proceeding. *See Matter of McMullen, supra,* at 548. Both the respondent and the Government had a "full and fair opportunity" to litigate the material issues resolved by the denaturalization judgment: there were no procedural limitations to full presentation of the issues and the parties obtained a thorough appellate review of the judgment. In addition, the Government's burden of persuasion in the denaturalization proceeding was the same as its burden in this proceeding. *See Woodby* v. *INS,* 385 U.S. 276, 285-86 (1966). Lastly, it is fair to apply collateral estoppel because both the respondent and the Gov-

---

[2] *See Lummus Co.* v. *Commonwealth Oil Refining Co.,* 297 F.2d 80, 89 (2d Cir. 1961), *cert. denied,* 368 U.S. 986 (1962); *see also* 1B J. Moore, *supra,* ¶0.441[4], at 744-47.

ernment reasonably could have foreseen that issues raised in the denaturalization proceeding might be raised in a subsequent deportation proceeding.[3] Since the general prerequisites have been met, we conclude that it is appropriate to apply the doctrine of collateral estoppel in this case.

We are aware that at first glance this conclusion would appear to be at odds with *Title* v. *INS*, 322 F.2d 21 (9th Cir. 1963), in which the United States Court of Appeals for the Ninth Circuit held that it was error for an immigration judge in a deportation proceeding to give collateral estoppel effect to a prior judgment of denaturalization. We find, however, that the court's holding in *Title* was limited to circumstances that are not present in the respondent's case.

*Title* involved an alien who had been denaturalized for concealing his membership in an organization which advocated the use of force or violence to overthrow the United States Government. Several years after the alien's denaturalization the Service instituted deportation proceedings against him, alleging essentially the same facts that had caused him to be denaturalized. *Id.* at 23. At the deportation hearing, the immigration judge refused to permit the alien an opportunity to submit evidence on his own behalf on the ground that the prior denaturalization judgment collaterally estopped the alien from litigating the material issues in the deportation proceeding. The Board affirmed the immigration judge's decision. *Id.*

On review, the Ninth Circuit remanded the case to the Board, requiring it to make a determination of deportability without applying collateral estoppel to the prior denaturalization judgment. The court held that the immigration judge's application of collateral estoppel had precluded the alien from exercising his statutory right to present evidence in his own behalf at the deportation hearing. *Id.* at 24. The court also held that the use of collateral estoppel had been unfair because the alien, who did not testify or present any

---

[3] Several of the issues that were necessary to the outcome of the denaturalization judgment, such as the issue of whether the respondent was inadmissible under the DPA at the time he entered the United States and the issue of whether the respondent assisted the Nazis in persecuting others, also pertain to grounds of deportability under the Act. *See, e.g.,* sections 241(a) (2) and (19) of the Act. The latter issue did not become pertinent to a ground of deportability until October 1978, when Congress enacted section 241(a)(19) of the Act. Pub. L. No. 95-549, § 103, 92 Stat. 2065, 2066 (1978) (codified at 8 U.S.C. § 1251(a)(19) (1982)). This was several months after the district court rendered its original decision in favor of the respondent. Nevertheless, throughout the appellate stages of the denaturalization case, both the respondent and the Government would have been aware that assistance in Nazi persecution was a ground for deportation. Thus, they reasonably could have foreseen that the persecution issue might also be raised in a subsequent deportation proceeding.

evidence in his denaturalization proceeding, might have proceeded differently had a recent Supreme Court decision defining Communist Party membership been in effect at the time of the denaturalization hearing. *Id.* at 24–25. In addition, the Ninth Circuit suggested, without holding, that to apply collateral estoppel to a denaturalization judgment rendered by a court would thwart Congress' intent that all determinations pertaining to deportability should be made solely by an immigration judge in a deportation proceeding. *Id.* at 24 and n.8.

Our decision to apply collateral estoppel in the respondent's case does not violate the holding of *Title*. The record does not reflect that the immigration judge used the denaturalization judgment to preclude the respondent from submitting relevant evidence in his own behalf at the deportation hearing. Moreover, our determination that the respondent's case satisfies the general prerequisites for application of the doctrine of collateral estoppel insures the fairness of its use in this proceeding. We note that adherence to those general prerequisites would have precluded the use of collateral estoppel in *Title* because the controlling law had changed between the time of the alien's denaturalization hearing and the time of his deportation proceeding. *See United States* v. *Stauffer Chemical Co.*, 464 U.S. 165 (1984) (the doctrine of collateral estoppel may be applied so long as there has been no change in the controlling law since the time of the prior proceeding).

As for the Ninth Circuit's suggestion that the use of collateral estoppel in deportation proceedings would be contrary to Congress' intent, we find nothing in the Act which indicates that Congress intended to commit issues pertaining to deportability solely to administrative determination, to the exclusion of pertinent determinations made by the courts. The apparent basis for the Ninth Circuit's suggestion is the language in section 242(b) of the Act, 8 U.S.C. § 1252(b) (1982), which provides that a deportation hearing before an immigration judge shall be "the sole and exclusive procedure for determining the deportability of an alien." *See Title* v. *INS, supra,* at 24. We do not construe this language to preclude the use of collateral estoppel in deportation proceedings, however. Rather, we construe it to exempt deportation proceedings from the provisions of any other laws, most particularly the Administrative Procedure Act of June 11, 1946, 60 Stat. 237, *repealed by* Pub. L. No. 89–554, 80 Stat. 378 (1966) ("APA"). Our conclusion is based upon the following case law and legislative history.

In 1949, in *Wong Yang Sung* v. *McGrath,* 339 U.S. 33 (1950), the Supreme Court construed the APA to apply to deportation proceedings, thereby requiring the Service to change the procedures then

in effect for determining the deportability of aliens. *Id.* at 44-46, 49-50. Shortly thereafter, in the Supplemental Appropriation Act for 1951, Congress enacted a temporary provision which exempted deportation proceedings from the APA. Pub. L. No. 81-843, ch. III, 1950 U.S. Code Cong. & Ad. News (64 Stat.) 1038, 1042. In 1951, while undertaking the substantial revision of our immigration laws which ultimately became the Immigration and Nationality Act of 1952, Congress sought to ensure that deportation proceedings would continue to be exempt from the APA, providing in legislative drafts of section 242(b) as follows:

> *Notwithstanding any other law, including the Act of June 11, 1946 (60 Stat. 237) [the APA], the proceedings . . . [in section 242(b)] shall be the sole and exclusive procedure for determining the deportability of an alien who is in the United States.*

S. 716, 82d Cong., 1st Sess. § 242(b) (1951); H.R. 2379, 82d Cong., 1st Sess. § 242(b) (1951) (emphasis added). The final version of section 242(b) which was enacted into law, and upon which the Ninth Circuit relied in *Title, supra,* did not contain the explicit reference to the APA or to other laws. It merely states:

> The procedure . . . [in section 242(b)] shall be the sole and exclusive procedure for determining the deportability of an alien under this section.

Pub. L. No. 82-414, § 242(b), 1952 U.S. Code Cong. & Ad. News (66 Stat.) 166, 209 (codified at 8 U.S.C. § 1252(b) (1982)). Nevertheless, Congress indicated that it understood this language to exempt deportation proceedings from the APA and from all other laws or treaties. *See* H.R. Rep. No. 1365, 82d Cong., 2d Sess. 60, 63, *reprinted in* 1952 U.S. Code Cong. & Ad. News 1653, 1710, 1713; *see also* S. Rep. No. 1137, 82d Cong., 2d Sess. 28, 30 (1952). This leads us to conclude that Congress intended the phrase "sole and exclusive procedure" in section 242(b) as enacted to retain its initial meaning, that is, to exempt deportation procedures from the APA and all other laws.

Since we do not construe the language of section 242(b) of the Act to preclude the use of collateral estoppel in deportation proceedings, we do not violate Congress' intent if we apply collateral estoppel to the respondent's denaturalization judgment. Moreover, our use of collateral estoppel in this case is consistent with previous precedent decisions in which we applied collateral estoppel in deportation proceedings to preclude relitigation of facts established by aliens' prior criminal convictions. *See, e.g., Matter of Rina,* 15 I&N Dec. 346, 347 (BIA 1975); *Matter of Z—,* 5 I&N Dec. 708 (BIA 1954).

*(1) Findings of fact conclusively established by the judgment in the denaturalization proceeding.*

Under the doctrine of collateral estoppel, a prior judgment conclusively establishes the "ultimate facts" of any subsequent proceeding. *The Evergreens* v. *Nunan*, 141 F.2d 927, 931 (2d Cir.), cert. denied, 323 U.S. 720 (1944); *see also Yates* v. *United States*, 354 U.S. 298, 338 (1957). An "ultimate fact" is one of those facts "upon whose combined occurrence the law raises the duty, or the right, in question." *The Evergreens* v. *Nunan, supra,* at 928. Thus, the denaturalization judgment is conclusive as to the "ultimate facts" in this proceeding, *i.e.,* those facts upon which the respondent's deportability and eligibility for suspension of deportation are to be determined. *Id.* at 932.

There are three general categories of facts which we consider to be "ultimate" in this case. The first category consists of facts which pertain to the respondent's citizenship and nationality. These are "ultimate facts" because they are relevant to the issue of the respondent's alienage and thereby determine whether he is subject to the various deportation provisions of section 241(a) of the Act.[4] The second category consists of facts which pertain to the respondent's activities as a prisoner of the Germans during World War II, and in particular to his activities at Treblinka. These are "ultimate facts" because they determine the respondent's deportability under sections 241(a) (1), (2), and (19), for willfully misrepresenting in his visa application the facts about his activities during World War II, for entering in violation of the DPA, and for assisting the Nazis in persecuting civilians. In addition, these facts are relevant to the respondent's eligibility for suspension of deportation, which is not available if he is deportable for assisting the Nazis in persecuting others. Section 244(a)(1) of the Act. *See* discussion *infra.* The third category of "ultimate facts" consists of facts pertaining to the respondent's application for a visa under the DPA and his immigration to this country in 1949. These are "ultimate facts" because they, too, determine the respondent's deportability under sections 241(a) (1) and (2).

The following facts established by the denaturalization judgment come within one of these three categories:

The respondent was born in the Ukraine in 1907. *Fedorenko* v. *United States*, 449 U.S. at 494. He was drafted into the Russian

---

[4] Section 241(a), which is the basis for the Service's charges of deportability, pertains only to an "alien." The term "alien" means any person who is not a citizen or national of the United States. Section 101(a)(3) of the Act, 8 U.S.C. § 1101(a)(3) (1982).

Army in 1941 but was captured by the Nazis shortly thereafter. After being held in several prisoner-of-war camps where he was beaten and deprived of food, he was selected by the Nazis, along with about 200 or 300 other Russian prisoners, to go to a concentration camp at Travnicki, in Poland, where he was trained to be a camp guard. *United States v. Fedorenko*, 455 F. Supp. at 900-01.

In September 1942, the respondent was taken by the Nazis, along with many other Russian prisoner-guards, to Treblinka, Poland, where he was given the position of an armed perimeter guard. 449 U.S. at 494, 500. Treblinka was a death camp at which several hundred thousand Jewish civilians were imprisoned and killed. *Id.* at 494 n.2. At Treblinka the respondent, like the other Soviet prisoner-guards, was given privileges that other prisoners did not have. For example, he was allowed to carry a rifle and a pistol and go on liberty for 4 hours to a nearby town, and he was given a small stipend by the Germans. 455 F. Supp. at 913. On the other hand, the respondent did not have the right to walk out of the gate of the camp at will, nor could he go wherever he wanted. *Id.* The respondent was always under the threat of death at Treblinka if he disobeyed his captors. *Id.* at 913-14.

On August 2, 1943, several Jewish prisoners at Treblinka attempted to escape. *Id.* at 914. The respondent and several other prisoner-guards were ordered by the German Commandant to fire at the escaping prisoners. *Id.* The respondent chose not to fire directly at any of the prisoners; instead, he shot over their heads. *Id.*

Treblinka was closed in 1943. 449 U.S. at 494. The Nazis thereupon moved the respondent to a labor camp at Danzig and then to a prisoner-of-war camp at Poelitz, where he also served as a guard. *Id.* Eventually the Nazis took the respondent to Hamburg where he served as a warehouse guard. *Id.* When the Allies invaded Germany in 1945, the respondent discarded his uniform and passed himself off as a civilian. *Id.*

In October 1949, the respondent applied for admission to the United States under the DPA as a displaced person. *Id.* at 496. In doing so, he falsified a visa application by lying about his wartime activities. *Id.* Specifically, his visa application indicated that he had been born in Sarny, Poland, and had been a farmer there until March 1942, at which time he had been deported to Germany and forced to work at a factory in Poelitz until the end of the war. *Id.*

Since the foregoing facts found in the denaturalization proceeding are also "ultimate facts" in this case, they are conclusively established by operation of the doctrine of collateral estoppel. *The Evergreens v. Nunan, supra,* at 931.

### (2) *Questions of law conclusively resolved by the judgment in the denaturalization proceeding.*

In the denaturalization judgment, the Supreme Court decided several matters of law which are material to the respondent's deportability. The Court concluded that the respondent's service as an armed concentration camp guard for the Nazis, whether voluntary or involuntary, made him ineligible for his visa under section 2(a) of the DPA, as a person who had "assisted the enemy in persecuting civilians." 449 U.S. at 512, 514. In reaching this conclusion the Court specifically determined that the respondent's activities at Treblinka constituted assistance in "persecution" within the meaning of the DPA. *Id.* at 512 n.34. The Court also concluded that the respondent's false statements in his visa application in 1949 were willful and material misrepresentations made for the purpose of gaining admission into the United States. *Id.* at 514. This conclusion led, in turn, to the conclusion that the respondent was thereafter inadmissible to the United States under the express terms of section 10 of the DPA. *Id.* at 514-15.

The doctrine of collateral estoppel may be applied to preclude reconsideration of an issue of law, as well as of fact, so long as the issue arises in both the prior and subsequent suits from virtually identical facts and there has been no change in the controlling law. *United States* v. *Stauffer Chemical Co., supra.* Under this rule, collateral estoppel precludes reconsideration of the issues of law discussed above. These issues arise in this proceeding in regard to the respondent's deportability under sections 241(a) (1) and (2) of the Act, for entering in violation of the DPA. Moreover, they arise out of the identical facts and the same principles of law that were considered by the Supreme Court in the denaturalization case.

### THE RESPONDENT'S DEPORTABILITY

The respondent does not contest the finding of deportability pursuant to section 241(a)(2) of the Act. Since there is an uncontested finding of deportability to support the order of deportation, we need not reach the issue of whether the immigration judge erred in finding the respondent deportable under section 241(a)(1) of the Act.

However, the respondent's deportability under section 241(a)(19) of the Act, as an alien who assisted the Nazis in persecuting others, is significant because it determines the respondent's eligibility for suspension of deportation. *See* section 244(a)(1) of the Act and discussion *infra.* We shall, accordingly, consider whether the immigra-

tion judge erred in finding the respondent deportable pursuant to section 241(a)(19). Collateral estoppel does not foreclose our consideration of this legal issue because the question of the respondent's deportability pursuant to section 241(a)(19) was not litigated in the denaturalization proceeding. *See Wilson* v. *Steinhoff,* 718 F.2d 550 (2d Cir. 1983).

Section 241(a)(19) of the Act provides for the deportation of aliens who

> during the period beginning on March 23, 1933, and ending on May 8, 1945, under the direction of, or in association with—
>
> (A) the Nazi government of Germany,
>
> (B) any government in any area occupied by the military forces of the Nazi government of Germany,
>
> (C) any government established with the assistance or cooperation of the Nazi government of Germany, or
>
> (D) any government which was an ally of the Nazi government of Germany,
>
> ordered, incited, assisted, or otherwise participated in the persecution of any person because of race, religion, national origin, or political opinion.

The respondent does not dispute that his forced service at Treblinka occurred between March 1933 and May 1945; nor does he dispute that he served at Treblinka "under the direction of the Nazi government of Germany." Rather, it is the respondent's contention that the Service failed to show he "assisted or otherwise participated in the persecution of any person because of race [or] religion." Specifically, the respondent argues that section 241(a)(19) requires the deportation only of those who voluntarily assisted the Nazis in persecuting others. He insists that his actions were found by the district court to have been involuntary[5] and that, accordingly, he is not within the ambit of section 241(a)(19). He also argues that his conduct at Treblinka did not constitute "persecution" within the meaning of section 241(a)(19) because he neither captured, shipped, nor processed Jews for extermination, nor did he abuse or mistreat them or commit any atrocities. In addition, he argues that his service at Treblinka did not constitute persecution "because of race or religion" because his actions were motivated by the threat of execution, not by racial or religious prejudice toward Jews.

---

[5] In the denaturalization proceeding, the district court found that the respondent did not volunteer for guard service and that the respondent faced the threat of swift execution if he disobeyed the Nazis. 455 F. Supp. 900-01, 913-14. The district court accordingly concluded that the respondent's service at Treblinka was involuntary. 455 F. Supp. at 913-14.

### (1) *"Assisted or otherwise participated in the persecution of any person."*

The term "persecution" as used in section 241(a)(19) contemplates the infliction of suffering or harm, under government sanction, upon persons who differ from others in the ways specified in the Act, *i.e.*, race, religion, national origin, or political opinion. *Matter of Laipenieks*, 18 I&N Dec. 433 (BIA 1983). The harm or suffering inflicted may take various forms but it most certainly includes physical confinement, torture, and death. *Id.* The facts established by collateral estoppel show that the Nazis imprisoned and then executed thousands of persons at Treblinka. The imprisonment and execution of the inmates of the camp clearly constitutes "persecution" of them within the meaning of section 241(a)(19). *See id.*

The respondent testified that he never committed any atrocities at Treblinka. The Service did not refute this testimony during the deportation hearing. Moreover, the testimony is entirely consistent with the district court's finding on the issue in the denaturalization proceeding.[6] However, the fact that the respondent never committed any atrocites at Treblinka would not necessarily relieve him of deportability under section 241(a)(19), which makes an alien deportable if he "assisted" in the persecution of others.

We have recently held that an alien's motivation and intent are irrelevant to the issue of whether he "assisted" in persecution within the meaning of section 241(a)(19) and that it is the objective effect of an alien's actions which is controlling. *Matter of Laipenieks, supra.* We conclude that the objective effect of the respondent's conduct as a perimeter guard would have been to aid the Nazis, in some small measure, in their confinement and execution of Jewish prisoners at Treblinka. *See id.* Since those activities amounted to "persecution," it follows that the respondent "assisted . . . in the persecution of others" within the meaning of section 241(a)(19).

It may be, as the respondent argues, that his service at Treblinka was involuntary. Certainly that was the conclusion reached by the district court in the denaturalization proceeding. We need not resolve the issue, however, because as a matter of law the respondent's motivations for serving as a guard at Treblinka are immateri-

---

[6] The district court specifically found that the respondent did not commit any atrocities. 455 F. Supp. at 908–09. Although the Government contested this finding on appeal, the Supreme Court accepted it as controlling for purposes of the case before it. 449 U.S. at 504, n. 24. Since the Supreme Court limited its acceptance of the disputed finding to the denaturalization case, we did not apply collateral estoppel to establish the finding in this proceeding.

al to the question of his deportability under section 241(a)(19) of the Act. *See id.* We recognize that this construction of section 241(a)(19) may lead to harsh or inequitable results for those aliens, like the respondent, who were captives of the Nazis and who may have been forced to serve, upon penalty of death, in capacities which aided the Nazis in persecuting others. However, it was Congress' intent that *all* who assisted the Nazis in persecuting others must be deported, and we must comply with that intent. *Id.*

#### (2) Persecution "because of race or religion."

It is undisputed that the prisoners at Treblinka were confined and killed because they were members of the Jewish race or religion. Again, it is irrelevant whether the respondent, himself, harbored any prejudice against the prisoners in the camp. The respondent's absence of racial or religious prejudice does not alter the fact that he "assisted" in physical persecution which occurred "because of" official Nazi policies against people of the Jewish race or religion. Thus, his conduct clearly constituted assistance in persecution "because of race or religion" within the meaning of section 241(a)(19) of the Act.

In view of the foregoing, we must conclude that the facts established by collateral estoppel show that between 1942 and 1943, under the direction of the Nazi government of Germany, the respondent assisted in the persecution of persons because of race or religion. Thus, the immigration judge did not err in finding the respondent deportable pursuant to section 241(a)(19) of the Act.

### THE RESPONDENT'S ELIGIBILITY FOR SUSPENSION OF DEPORTATION

The respondent's application for suspension of deportation pursuant to section 244(a)(1) of the Act was filed with the immigration judge at the deportation hearing on July 7, 1981. Over 6 months later, on December 29, 1981, Congress made suspension of deportation unavailable to aliens deportable under section 241(a)(19) for assisting the Nazis in persecuting others. Pub. L. No. 97-116, § 18(h)(2), 95 Stat. 1611, 1620 (1981) (codified at 8 U.S.C. § 1254(a)(1) (1982)). The respondent contends that the immigration judge erred in finding him ineligible for suspension of deportation on the basis of this 1981 amendment to section 244(a) because the amendment should not have been applied retroactively to his suspension application.

70

The 1981 amendment obviously restricts the discretionary relief from deportation that is available to aliens. Congress has the power to make such a restriction retroactive if Congress so intends. *Artukovic* v. *INS*, 693 F.2d 894, 897 (9th Cir. 1982). In order to determine Congress' intent we must examine the pertinent legislative history.

In explanation of the 1981 amendment Congress wrote:

[This amendment] clarifies in [section] . . . 244(a) of the Act the inapplicability of [the] suspension of deportation . . . [provision] to aliens who have participated in the Nazis' persecution of others. This *conforms [this provision] to the strict policies reflected in title 1 of Public Law 95-549.*

H.R. Rep. No. 264, 97th Cong., 1st Sess. 34, *reprinted in* 1981 U.S. Code Cong. & Ad. News 2577, 2603 (emphasis added). Title 1 of Public Law 95-549, which was enacted in 1978, made aliens who participated in persecution under the Nazis excludable, deportable, and ineligible for temporary withholding of deportation and voluntary departure, two other forms of relief from deportation. Pub. L. No. 95-549, §§ 101, 103-05, 92 Stat. 2065, 2066 (1978) (codified at 8 U.S.C. §§ 1182(a)(33), 1251(a)(19), 1253(h)(2), 1254(e) (1982)). One of the stated purposes of Public Law 95-549 was to facilitate the exclusion and deportation of all aliens who persecuted others. H.R. Rep. No. 1452, 95th Cong., 2d Sess. 1, *reprinted in* 1978 U.S. Code Cong. & Ad. News 4700.

The foregoing legislative history shows that Congress considered the 1981 amendment to be a clarification of the anti-Nazi legislation of 1978. This leads us to conclude that Congress intended the 1981 amendment to relate back to that earlier legislation and to be applied in all cases subject to its provisions. Since it is undisputed that the respondent is subject to the provisions of the 1978 legislation, he is also subject to the 1981 amendment.

This conclusion is consistent with other cases involving amendments to the Act which curtailed the discretionary relief available to an alien between the time of his hearing and the time of the decision in his case. In such cases, it was the new law in effect at the time of the decision, not the law in effect at the time of the hearing, that was applied. *See Patsis* v. *INS*, 337 F.2d 733 (8th Cir. 1964), *cert. denied*, 380 U.S. 952 (1965); *Foti* v. *INS*, 332 F.2d 424 (2d Cir. 1964); *Fassilis* v. *Esperdy*, 301 F.2d 429 (2d Cir. 1962); *Matter of George and Lopez-Alvarez*, 11 I&N Dec. 419 (BIA 1965).

For the foregoing reasons, we conclude that the respondent's suspension application is subject to the 1981 amendment to section 244(a)(1) and must be judged by the law currently in effect. Under this law, the respondent is not eligible for suspension of deportation because he is deportable for assisting the Nazis in the persecu-

tion of others. Since the respondent is ineligible for suspension of deportation, we need not address his arguments on appeal that he has satisfied the statutory prerequisites for that relief and is deserving of a favorable exercise of discretion.

## MISCELLANEOUS MATTERS

### (1) The conduct of the immigration judge

The respondent argues that the immigration judge showed improper bias and should be reversed because he disregarded the district court's finding on the issue of the voluntariness of the respondent's service at Treblinka, he mischaracterized the respondent's testimony,[7] and he applied his own moral standards to assess the respondent's actions during World War II. The respondent has also argued in his Notice of Appeal (Form I-290A) that the immigration judge erred in his rulings on the admissibility of evidence; however, the respondent did not pursue this basis for appeal in either his briefs or his oral argument and we consider this argument to have been withdrawn.

Collateral estoppel does not conclusively establish the district court's finding on the issue of the voluntariness of the respondent's conduct at Treblinka.[8] Accordingly, the immigration judge did not err as a matter of law in disregarding the district court's determination. Moreover, as noted earlier, the issue is immaterial to a determination of deportability.

We do consider several of the immigration judge's comments about the respondent's character and motivations to have been ill-advised. In addition, we cannot agree with the immigration judge's characterization of the respondent's testimony.[9] Nevertheless, ill-

---

[7] The immigration judge found the respondent's testimony at the deportation hearing to be inconsistent, equivocal, and self-serving.

[8] The finding was contested by the Government on appeal in the denaturalization case, see 597 F.2d at 949, but was never resolved because the Supreme Court found it to be immaterial to the outcome of the case. 449 U.S. at 512. Thus, the district court's finding was neither fully litigated nor necessary to the denaturalization judgment and is not subject to the doctrine of collateral estoppel. See discussion of collateral estoppel supra.

[9] Our review of the record persuades us that with a few exceptions attributable to the passage of time, the respondent's testimony was entirely straightforward and consistent. The instances which the immigration judge characterized as equivocation, we view as either confusion or lapse of memory on the respondent's part. These instances invariably occurred not when the respondent was testifying about the ultimate facts of his case, but when he was asked by the Service if he remem-
*Continued*

72

advised comments and a mischaracterization of testimony do not necessarily demonstrate bias on the immigration judge's part. We have carefully examined the record and find that the immigration judge conducted a fair hearing, showing neither a preference for, nor a prejudice against, the position of either party.

In any event, in reaching our conclusions that the respondent is both deportable and ineligible for suspension of deportation, we did not adopt either the immigration judge's comments or his perception of the respondent's testimony. Therefore, the respondent has not been prejudiced and his right to a fair hearing has not been compromised. *See, e.g., Ka Fung Chan v. INS,* 634 F.2d 248, 258 (5th Cir. 1981); *United States v. Calles-Pineda,* 627 F.2d 976, 977–78 (9th Cir. 1980); *Garcia-Jaramillo v. INS,* 604 F.2d 1236, 1238–39 (9th Cir. 1979); *Chung Young Chew v. Boyd,* 309 F.2d 857, 864–65 (9th Cir. 1962).

### (2) *Matters raised at oral argument*

At oral argument before the Board, the respondent's counsel submitted a motion to strike the Service's response to his reply brief, contending that appellate procedure does not permit the filing of such a brief, that the brief was beyond the scope of the record in the case, and that the brief was designed to improperly influence the Board's decision. The respondent's counsel also asked us to place into the record a recent letter from the respondent's physician, which expresses the opinion that the respondent would not survive deportation to the U.S.S.R.

The motion to strike has no merit whatever and will be denied. The filing of briefs is a matter within the sound discretion of the Board. *See* 8 C.F.R. § 3.3(c) (1984). In this case we concluded that it was appropriate to accept the Service's response to the respondent's reply brief. We do not find that the arguments made in the Service's brief exceed the record; nor do we find that the filing of the brief was unfair. We note that the respondent had ample opportunity at oral argument to dispute the contentions in the Service brief.

We will also deny the request to supplement the record with the letter from the respondent's physician. We have no doubt that the letter is relevant to the "extreme hardship" requirement for sus-

---

bered details of previous testimony or statements given 3 to 5 years before his deportation hearing. The respondent's confusion or lapse of memory during such questioning is understandable given his age and the amount of time that had elapsed since he had given the previous testimony. Moreover, we do not find the respondent's testimony to have been unduly self-serving.

pension of deportation. Nevertheless, the Act provides that all evidence which is pertinent to determinations made during deportation proceedings, such as the determination of the respondent's eligibility for suspension of deportation, must be adduced in the hearing before the immigration judge.[10] The Board is an appellate body whose function is to review, not to create, a record. *See* 8 C.F.R. §§ 3.1(b), 3.5 (1984). Thus, it would be inappropriate for us to accept the evidence proffered by the respondent. Moreover, the letter from the respondent's physician is immaterial to the outcome of this case, given our conclusion that the respondent is precluded by law from obtaining suspension of deportation by virtue of his deportability pursuant to section 241(a)(19).[11]

**ORDER:** The appeal is dismissed.

---

[10] Determinations of deportability may be made only upon a record created in a section 242(b) deportation proceeding before an immigration judge. 8 U.S.C. § 1252(b) (1982). The issue of an alien's eligibility for suspension of deportation is one of those matters which is incident to a determination of deportability in such a proceeding. *See Foti* v. *INS,* 375 U.S. 217, 229–33 (1963).

[11] Our conclusion does not preclude the respondent from submitting the letter to the appropriate district director of the Service in connection with a request for any administrative relief he may wish to pursue.